## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | CIVIL ACTION |
| NAOMI C. SATTERWHITE | : | |
| | : | |
| Plaintiff, | : | No. 2:09-CV-01024 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MONTGOMERY COUNTY, *et al.* | : | |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFF'S BRIEF IN RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, by and through her undersigned counsel, hereby avers as follows in response to Defendant's Motion for Summary Judgment:

**A.**     **Procedural History**

Plaintiff initiated the instant action on March 10, 2009 to seek redress for race discrimination by Defendant. Plaintiff, an employee of Defendant, asserts that Defendant failed to interview her or hire her for a number of open full time judicial secretary positions. After discovery closed, Defendant filed a motion for summary judgment (Docket Item No. 31). That motion is now ripe for disposition.

For the reasons set forth herein, the motion should be denied, as genuine issues of material fact remain as to Plaintiff's claims that she was denied a full-time position as a result of her race.

**B.**     **Statement of Facts**

Plaintiff, Naomi Satterwhite (hereinafter referred to as "Naomi") is African-American. She began her secretarial career with Horace A. Davenport in 1955 while she was attending Norristown Business College and he was starting up his practice. *See* Letter from Horace A.

Davenport, Retired Judge, hereto attached and incorporated herein as Exhibit "1". Naomi acted as Judge Davenport's receptionist, bookkeeper and legal secretary. *Id.* She set up his office and was a very reliable employee who fulfilled her obligations above and beyond the call of duty. *Id.* When Horace Davenport became a partner in the firm of Gerber, Davenport and Wilenzik, Naomi worked cooperatively with five other secretaries and organized and initiated a new filing system for the office. *Id.* She was a loyal and efficient secretary and, in 1976 when Horace A. Davenport began his duties as a Judge in the Montgomery County Court of Common Pleas, Naomi came with him. *Id.* Naomi developed a filing system for Judge Davenport's chambers. *Id.* She knew all of the procedures required for family court, criminal court and civil court. *Id.* She was thorough and when new computers came in, she stayed after hours to experiment with her computer to see what it could do. *Id.* She retired as a Montgomery County employee in the year 2000 and returned for a short time in 2002 until the end of December of that year because Judge Davenport's secretary had become ill and had returned to Alabama. *Id.* During that time, she did what she was asked to do cheerfully and without complaint. *Id.* During that summer, Naomi also worked for Judge Vogel, in addition to working for Judge Davenport. Satterwhite Deposition, 11:18 (hereinafter referred to as "Satterwhite Dep." and attached herein as Exhibit "2").

In the Fall of 2005, Naomi wanted to return to part-time employment at the Courthouse. Satterwhite Dep. 15:1-7. Naomi made her application for a tipstaff/floating judicial secretary on November 2, 2005. Deposition of Carol Dillon 23:18-21; 28:4-7 (hereinafter referred to as "Dillon Dep." and incorporated and attached hereto as Exhibit "3"). Carol Dillon is the Deputy Court Administrator and Director of Court Services. Dillon Dep. 6:13-15. She reports to Michael Kehs, who is her direct supervisor. Dillon Dep. 9:3-7. Michael Kehs is the District Court Administrator for the 38th Judicial District, which comprises Montgomery County.

Deposition of Michael Kehs 7:18-21 (hereinafter referred to as "Kehs Dep." and attached hereto and incorporated herein as Exhibit "4"). Michael Kehs reports to the President Judge of the judicial system, who is ultimately in charge of human relations at the Court. Kehs Dep. 17:19-18:12. Carol Dillon wanted Michael Kehs and President Judge Corso to be aware that Naomi was applying for a floating Judicial Secretary position even though there was no opening at the time. Dillon Dep. at 24:6-14. The only purported reason for so informing Michael Kehs and President Judge that Naomi had now reapplied was "so that they are in the know." Dillon Dep. at 26:1-18. Carol Dillon actually met with Michael Kehs and President Judge Corso to let them both know that Naomi's application had come in. Dillon Dep. at 28:18-18. Shortly after Naomi's application was tendered on November 2, 2005, Judge Davenport happened to call while Michael Kehs, Carol Dillon and President Judge Corso were meeting, to express his desire for Naomi to be considered as a tipstaff. Dillon Dep. at 29:9-14. *See also* the application of Naomi Satterwhite for employment, hereto attached and incorporated herein as Exhibit "5".

Approximately ten days after Naomi's application, Carol Dillon, Michael Kehs and Judge Corso met on or about November 13, 2005 to discuss the fact that Naomi would be a "better fit for the tipstaff position" than as a judicial secretary, even though there was no vacancy for a judicial secretary at the time. Dillon Dep. at 57:24-58:7; 58:19-59:4; 59:5-11; 60:7; 60:19-26. The discussion between President Judge Corso, Michael Kehs and Carol Dillon centered on the fact that even though Naomi was applying for a judicial secretary position, and even though one was not available, Naomi would be better off in the tipstaff position than as a judicial secretary. Dillon Dep. at 61:1-9. The discussion precluding Naomi from any judicial secretary position apparently occurred after Judge Davenport called, requesting that Naomi be hired as a tipstaff. Dillon Dep. at 63:18-24. According to Carol Dillon, President Judge Corso said that Naomi would not be able to "stir the pot" as a tipstaff. Dillon Dep. 62:10-12. President Judge Corso

denies ever saying that Naomi would not be able to "stir the pot" as a tipstaff. *See* Deposition of the Honorable Gerald Corso; 31:5-15 (hereinafter referred to as "Corso Dep." and attached and incorporated herein as Exhibit "6"); 34:7-10.   Judge Corso also has no recollection of ever raising the issue that Naomi would be a better fit in a tipstaff position than she would be in a judicial secretary position.  Corso Dep. at 36:23-37:13.  Judge Corso said he would not even be concentrating on that issue at that time because no Judicial Secretary substitute positions were even available.  *Id.*  Carol Dillon stated that the reason Naomi was a better fit for the tipstaff position than as a judicial secretary was because Naomi was not a rule follower.  Dillon Dep. at 58:8-10.   However, Judge Corso believed that Naomi would fit the criteria with regard to her technical skills for a judicial secretary position and did not know of any problems that she had ever had with Judge Davenport.   Corso Dep. at 11:6-13; 17-24.   Also, Judge Corso had no opinion or knowledge about Naomi being any kind of problem or being a rule breaker or being troublesome.  Corso Dep. at 13:6-11.

Judge Davenport stated that "at no time did Naomi do things on her own."  Exhibit 1. Michael Kehs stated that he had difficulty dealing with Naomi on a number of occasions and as a result of that difficulty and as a result of the review from the tipstaff supervisors after her sixty day probationary period and in light of the number of judges who did not want Naomi assigned to their individual chambers, Kehs stated that Naomi would not be an appropriate fit for a part time judicial secretary's position.  Kehs Dep. at 45:19-46:9.  However, Michael Kehs allegedly made the determination that Naomi would not be an appropriate fit prior to any review from the tipstaff supervisors and prior to any determination from any judges indicating that they did not wish Naomi to be assigned to their individual chambers.  Also, Michael Kehs claims his apparent understanding that Naomi would not be a good fit came not from himself but from Judge Corso. Kehs Dep. at 48:9-12.

4

Kehs also claims that Judge Corso allegedly told him that his experience with Naomi, in a general way, indicated that there was "difficulty at times dealing with Naomi" and that she would not be an appropriate fit as a judicial secretary. Kehs Dep. at 48:13-21. *Judge Corso testified, however, that he primarily relied upon the information given to him by Carol Dillon and Michael Kehs regarding Naomi.* Corso Dep. at 30:15-16. He denied any specific knowledge about Naomi but just had general knowledge about her as a person. Apparently, she had been on a board with Judge Corso's wife in Norristown and he had known her for some considerable time. The information he had was not negative. Corso Dep. 43:14-44:19; 44:22-45:1.

The only example that Carol Dillon could even quote about Naomi allegedly not being a rule follower was a single occasion when Naomi put in 8 hours instead of 6 ¾ as a secretary and requested compensation for the extended time. Dillon Dep. at 17:3-23; 18:1-23. This request for extended time only happened once and *there was nothing else* with regard to alleged rule breaking that Carol Dillon could recall about Naomi. In fact, Carol Dillon could recall no specific examples of *any* problems with Naomi. Dillon Dep. at 18:23 to 19:3; 19:4-25. Judge Richard Hodgson indicated that he had never been given any specifics regarding any problems with Naomi's work. Deposition of Richard J. Hodgson, 14:12-15 (hereinafter referred to as "Hodgson Dep." and attached hereto and incorporated herein as Exhibit "7").

According to Michael Kehs, it was not Naomi's lack of secretarial skills which had anything to do with the determination that she would not be "a good fit". Kehs Dep. at 96:13-19. Michael Kehs stated that his understanding that Naomi would not be a good fit came from Judge Corso. Kehs Dep. at 48:9-12. However, despite the allegation that there was difficulty at times dealing with Naomi, Michael Kehs never had occasion to talk to her about the way she approached problems. Kehs Dep. at 56:21-57:4. Further, Michael Kehs never advised that the

way Naomi went about things was not in keeping with what was expected at Court and his alleged reason for not advising her about this was that he had come "to expect" that that is what he would have to deal with with Naomi. Kehs Dep. at 57:5-10.

Michael Kehs stated that the problem was more that Naomi would do things in her own way. It was allegedly an attitude that was expressed in her writings to the paymaster and everything else. It was for this reason that he was not willing to recommend her being employed full time and "other incidents" that were documented in terms of her conduct as a tipstaff and the fact that certain judges did not want her in chambers. Kehs Dep. at 61:6-17; 18-62:1. There is no evidence supporting this, however.

Judge Davenport, in his affidavit, indicates that Naomi's advocacy, for a chair rail and other appropriate furnishings, created problems with the Court Administration Office. Exhibit "1".

Naomi was hired as a tipstaff and reported to the job on January 2, 2006. Satterwhite Dep. at 16:14-24. She signed in and was given her assignment by Dolly Strizziere, supervisor of the tipstaffs. Satterwhite Dep. at 23:10-14. Despite the fact that the she knew what to do, she followed all of the rules and allowed another tipstaff to accompany her even though she did not need any assistance. Satterwhite Dep. at 29:16-20. Someone was required to be with her during her sixty day probationary period. Satterwhite Dep. at 31:1-5. In February of 2006, Naomi was the victim of an offensive racial joke. She walked into the tipstaff office and three black women informed her that there had been a racially offensive sexual joke.

Naomi took the initiative and complained about the joke to Carol Dillon's office.. Satterwhite Dep. at 40:11-18; 42. The people circulating the joke included an employee named Jean Milus. Milus could not believe that Naomi had taken offense to it. Dillon Dep. at 36:6-24.

Judge Corso and Michael Kehs were also informed of the joke and Naomi's complaint about it to Carol Dillon.  Dillon Dep. at 37:19-23.

In March 2006, Naomi was assigned to Judge Furber's courtroom to shadow Norma Prinzo, who was well-known as a problem employee.  Satterwhite Dep. at 47:20-49:12.  Naomi was treated with significant disrespect by Norma Prinzo.  Naomi was ignored and treated as if she was not there.  Satterwhite Dep. at 50-52:18.  Naomi requested another assignment and was told that she had to ignore the way she had been treated.  Naomi told Dolly Strizziere that she had never been treated in this way in all of the years she had worked at the courthouse and she wrote a letter about her treatment and gave it to Dolly.  This letter is attached hereto and incorporated herein as Exhibit "8".  Satterwhite Dep. at 52:19-53:2; 11-18.

Carol Dillon wanted to know if Norma Prinzo had spoken rudely to Naomi or if she was "just being Norma".  Dillon Dep. at 42:16-19.  Carol Dillon agreed that Norma could have been "rude or abrupt".  Dillon Dep. at 44:7-12.  Naomi believed that Norma's behavior could have been in retaliation for complaining about the racial joke because Norma and the person who perpetrated the joke were exceptionally good friends.  Satterwhite Dep. at 59:7-11.  Naomi also believed that she was retaliated against by Dolly Strizziere because Dolly Strizziere and Jean Milus were very good friends.  Satterwhite Dep. at 72:14 – 73:2.  In any event, Naomi never complained about racial discrimination in this regard because she felt it would not do any good. Satterwhite Dep. at 73:12-74:4.

Naomi successfully completed her tipstaff probationary period and received a pay raise. Satterwhite Dep. at 75:10-11; 20.  Carol Dillon stated that there were some incidents that Naomi's supervisor reported during her probation as a tipstaff but none of these so-called "incidents" are reported anywhere in writing in any document.  Dillon Dep. at 31:2-5.

After her probationary period, Naomi was hired as a tipstaff and her probationary period was not extended.  Dillon Dep. at 34:12-14; 15-18.  The only criticism of Naomi by Dolly Strizziere was that Naomi informed the tipstaffs "that she was a former secretary for Judge Davenport for many years, and that she knows the courthouse well and also is aware of all the functions of the court system."  Consequently, she felt she did not require a tipstaff to escort her during her training period.  *See* Exhibit "9", Dolly Strizziere's letter regarding Naomi Satterwhite's completion of her sixty day training period on March 30, 2006.  Dolly Strizziere concluded that Naomi should be more supportive to her "fellow" workers.  "She appears to act independently of everyone else and gives the impression that she is more knowledgeable than everyone else (because of her past experience) (several have conveyed this attitude to me)."  These are the only "criticisms" in any documentation regarding Naomi's probationary period as a tipstaff.  *Id.*

In July 2006, Defendant posted the position of "On-Call Substitute Judicial Secretary" and on August 17, 2006, offered the position to Jenny Hayden (a Caucasian).  *See* Exhibit "10", November 21, 2007 letter from Carol Dillon to Michael Kehs, Esquire, Pg. 2, Fourth Paragraph.  Plaintiff was never contacted regarding this position.  In October 2006, Defendant posted the position for Judicial Secretary Substitute.  *Id.*  Plaintiff was not informed of this posting nor contacted regarding it.  Satterwhite Dep. at 76:13-15.

In September 2006, Naomi having worked in Judge Barrett's courtroom for the week of September 11th, met Jenny Hayden and assisted her with her work.  Satterwhite Dep. at 77:4-78:4.

On September 14, 2006, Naomi called Carol Dillon and told her that she was interested in the floating secretary position.  Satterwhite Dep. at 79:11-13.  Carol Dillon said that she would get back to Naomi and Naomi waited and waited and on November 1, 2006, she called Carol

Dillon again and was told to come up to her office. Satterwhite Dep. at 79:11-24. Naomi told Carol that she was interested in the "floating secretary" position which she referred to as a part-time on call secretary position. Satterwhite Dep. at 80:21-24.

Although Naomi did not hear from Carol Dillon until November 1, 2006, Carol Dillon once again told Michael Kehs that Naomi had applied for the job. Dillon Dep. at 56:18-22; 57:9-10. Michael Kehs then spoke to Judge Corso privately about how to handle Naomi's application. Carol Dillon was not present at that meeting. Dillon Dep. at 57:11-17. Judge Corso does not recall seeing Michael Kehs privately about the application of Naomi Satterwhite for the on-call judicial secretary position. Corso Dep. at 20:24-21:6; 23:7-9.

Michael Kehs however, states that he did have discussions with Judge Corso when Naomi applied for the full-time position in 2006 but cannot recall the content of those specific conversations. Kehs Dep. at 45:2-18. Michael Kehs says that he discussed with Carol Dillon whether Naomi would be appropriate for the full time position which was available; *i.e.;* "the floater position". Kehs Dep. at 45:2-18.

Following the discussion between President Judge Corso and Michael Kehs outside of the presence of Carol Dillon, Carol Dillon received a phone call from Judge Corso telling her to go through the applications and make recommendations based on the applications she had. Dillon Dep. at 69:14-19. The conversation which allegedly took place back in November 2005 in which Judge Corso allegedly indicated that Naomi best be suited for a tipstaff (and which Judge Corso denied ever having) was never mentioned. Dillon Dep. at 69:22-70:5. When Judge Corso received the applications with Dillon's synopsis hereto attached as Exhibit "11", Dillon reminded Judge Corso that Naomi was interested in a part-time judicial secretary's position and, based on her attitude as a tipstaff and three judges who apparently did not wish her to sit in their

chambers, Judge Corso thought she would not be a good fit for a judicial secretary substitute. Dillon Dep. at 70:8-20.

Apparently, Judge Corso had felt that way before Naomi had even been a tipstaff. In fact, he had felt that way when she first reapplied for a job at the Montgomery County Courthouse. Dillon Dep. at 70:21-71:3.

There is no documentary evidence indicating at any time that three particular Judges: Judge Tressler, Judge Nicholas and Judge Vogel did not want Naomi in their courtroom. Dillon Dep. at 72:7-16; 73:2-5. In fact, Judge Nicholas did have Naomi in his courtroom and was happy with her work. *See* Deposition of the Honorable William Nicholas (hereinafter referred to as "Nicholas Dep." hereto attached as Exhibit "12") 7:9-11 (referencing a document dated November 12, 2008); *see also* the Affidavit of Naomi Satterwhite hereto attached as Exhibit "13", with the allegation that Judge Vogel did not wish to have Naomi in his courtroom. Judge Corso had no idea why Judges Nicholas, Tressler and Vogel allegedly did not want Naomi in their chambers. Corso Dep. at 24:10-15.

Naomi's interview with Carol Dillon for the substitute secretary position was very short and lasted only about 5 minutes. Satterwhite Dep. at 82:16-17; 22-83:3. As a follow-up to the interview, Naomi sent a letter to Carol Dillon, hereto attached and incorporated herein as Exhibit "14". Satterwhite Dep. at 85:8-10.

Naomi was available for the on-call floater position and all she required was an approximate schedule for her services rather than waiting for a call. There was no discussion regarding the issue that if she was hired as an on-call floating secretary, she would be expected to get calls at 5 minutes after 8:00 to come in for that particular day. Satterwhite Dep. at 89:1-8; 23-90:5.

Michael Kehs admits that when Naomi's application came in, for the foregoing job, he had already formed an opinion about the fact that she would allegedly not be a good fit. Kehs Dep. at 85:21-86:1. Carol Dillon put together a synopsis of the applications for Judge Corso's review. Dillon Dep. at 70:8-20. According to Carol Dillon, Judge Corso had also felt that Naomi would not be a good fit for a judicial secretary even before she had been a tipstaff when she had first reapplied for a judicial secretary position with Montgomery County. Dillon Dep. at 70:21-71:3. Judge Corso told Dillon to prepare the document (attached as Exhibit 13) because Defendant was posting for a full-time judicial substitute secretary position and there would be applications which he would have to review and from which he would have to distill information. Corso Dep. at 25:20-26:4. Judge Corso does recall a meeting between Carol Dillon, Michael Kehs and himself to determine who would go to the next stage and be orally interviewed. Corso Dep. at 26:21-27:1. Judge Corso stated, in his deposition, that Naomi was not interviewed because the job was for a full-time position. Corso Dep. at 27:8-13. However, on correction, noting that it was for a part-time position, Judge Corso then said it was because Naomi was retired out on a county pension so she would allegedly not be interested in a full-time position. Corso Dep. at 27:19-28:2. Judge Corso does not know whether the decision not to interview Naomi was made prior to the creation of Exhibit 14 or at his meeting with Michael Kehs and Carol Dillon. Corso Dep. at 28:12-19; 29:2-12.

Judge Corso stated that he primarily relied upon information given to him by Carol Dillon and Michael Kehs and stated that there apparently were difficulties during Naomi's training and services as tipstaff, but he does not know the timing. Corso Dep. at 30:15-16; 21-23.

According to Carol Dillon, Judge Corso wanted to set up an interview with four possible candidates, and Naomi was not amongst them. Dillon Dep. at 77:2-22. Allegedly, Defendant knew of Naomi's credentials so it did not have to interview her. Dillon Dep. at 78:20-79:5.

Judge Corso apparently made his decision as to who to interview on the basis of resumes and input received from Michael Kehs and Carol Dillon. Corso Dep. at 43:5-9. Judge Corso also wanted Dillon to afford Naomi a "courtesy interview". Dillon Dep. at 80:5-10. Michael Kehs stated that Naomi was considered for the position because "when we determine whether or not someone is an appropriate fit, that doesn't mean they weren't considered for the position." Kehs Dep. at 85:1-7.

On November 16, 2006, Carol Dillon informed Naomi by letter that she was not selected for the position. *See* Exhibit "15". In March or April of 2007, Naomi found out that the County had hired two part-time on-call secretaries after their previous hire of November of 2006. Satterwhite Dep. at 102: 20-24. The two Caucasian secretaries hired were Marie Coonahan, who was a Medical Secretary, and Joyce McCafferty, who had been a tipstaff and was a secretary in the Youth Department. Satterwhite Dep. at 103:10-13. Naomi found out that Joyce McCafferty had actually been called in by Court Services, informed that her application showed that she had worked as a secretary in the Youth Department, and asked if she was interested. Satterwhite Dep. at 103:14-20. Joyce McCafferty *never even applied for the position* but was approached by Court Services to fill it. Satterwhite Dep. at 103:24 – 104:10.

After the Defendant had hired two Caucasian women for these positions, Naomi wanted to see if Defendant was ever going to consider her and she waited to see what was going to happen. Satterwhite Dep. at 106:1-5. Naomi was doing work as a tipstaff and Defendant knew that she was qualified because she had done judicial secretarial work for 26 years and was even

doing it as a tipstaff but receiving minimal wages while the "white women were receiving maximum wages per hour". Satterwhite Dep. at 106:6-11.

Naomi worked as a secretary for 18 days and then 13 days mainly in 2006 but was paid as a tipstaff during that time. Satterwhite Dep. at 106:12 – 107:1. Naomi did inform Dolly Strizziere that she was doing these additional functions when she was assigned to chambers. Satterwhite Dep. at 107:19-22.

Even though Naomi was interviewed for the part-time judicial secretary's job back in November 2006 (the courtesy interview) Naomi does not believe that she was truly considered. Satterwhite Dep. at 118:8. In her letter to Court Administration, on October 31, 2007, hereto attached as Exhibit 16, Naomi meant to mention that she had not been hired for the substitute secretary position and wanted to correct the record in that regard. Satterwhite Dep. at 119:8-15. Instead, she used the term "floater" but meant "part-time on-call". Satterwhite Dep. at 123:4. Exhibit 16 specifically indicates that the Court was hiring other floaters but no one was getting back to Naomi despite her interest in the part-time position. Satterwhite Dep. at 123:11-20. "When I applied for the floating position I did not seek the assistance of any of the judges that I had assisted. I wanted to see how I would fare on my own. Meanwhile, I watched as all of the floaters were hired, and I as a tipstaff was still doing the responsibilities of a floater." *Id.* The letter stated that there were law clerks, court criers and many attorneys who asked why Naomi was not a floating secretary and, after she informed them of the "interview", the rejection, and that she had not even be considered for any of the floater positions, they were absolutely shocked. *Id.*

When Naomi's letter (Exhibit 16) arrived, Carol Dillon went to Michael Kehs to give him a copy. Dillon Dep. at 86:16 – 87:1. Michael Kehs said he would respond but he had no discussion with Carol Dillon as to what the response might be. Dillon Dep. at 87:2-24.

Apparently, Michael Kehs responded to the letter because he was Carol Dillon's Supervisor. Dillon Dep. at 88:20-22.  The response letter of Michael Kehs is hereto attached as Exhibit 17. Naomi responded to Michael Kehs's letter of November 1st with her own letter dated November 13th (attached as Exhibit 18).  Naomi's letter raised a number of questions.  In particular Naomi asked how long a resume was to be held before it was no longer considered.  She also requested clarification as to whether she was not selected for two separate positions (given to the two Caucasian women) and requests a copy of the job qualifications and specifications she believes were posted for these two positions.  She also mentioned that several floater secretary positions were filled in 2007 and that the last floater position was filled in July of 2007.  Naomi reiterated her past and ongoing interest in a floater position and notified Michael Kehs yet again that when such a position became available, she would be interested.  She also asked whether her rejections could be as a result of her not having "a friend or relative of someone who is politically attached to the court system?"  She also requested the hiring dates of the two Caucasian women who were hired in her place.  Marie Coonahan, who had a medical background and was hired a judicial floater and was the sister to Patrick Coonahan, Esquire an Assistant District Attorney and Joyce McCafferty who was also hired as a floater was the wife of Mr. McCafferty a tipstaff.

Naomi's letter further references one Barbara Loeper, who was the Court's last hire for a judicial secretary in July of 2007.  Finally, the letter ends with Naomi's statement "I seriously question whether my previous experience and qualifications were considered against the job specifications and the qualifications of those who were hired." *Id.*(emphasis in original);  *see also* Satterwhite Dep. 134:19 – 138:17.

Naomi never received any response to her November 13th letter from Michael Kehs. Satterwhite Dep. at 138:22-24.

On January 9, 2008, Mark Turetsky, Esquire, then the attorney for Naomi, informed Michael Kehs by phone that Naomi was interested in the substitute secretary position which would become available when Carol Piantone, the current substitute secretary, became the full-time secretary to Judge Calvin Drayer. *See* Exhibit "19", Affidavit of Mark Turetsky. Judge Drayer's long-time secretary last worked on March 7, 2008 and Carol's effective date as Judge Drayer's secretary was March 10, 2008. Mr. Turetsky not only informed Mr. Kehs that Naomi was interested in replacing that substitute secretary, he also communicated that Naomi felt she was a victim of racism in that she had not previously been hired for any of the secretary positions, substitute or floating and further, and in light of the fact that Mr. Kehs had entirely failed to respond to Naomi's letter written to him on November 13, 2007. *See also* the EEOC Complaint of Naomi Satterwhite (last page) February 29, 2008 hereto attached and made a part as Exhibit "20".

Following the accusation of racism by Mark Turetsky, Naomi was hired as a judicial secretary substitute on March 26, 2008. Satterwhite Dep. at 142:17-20.

## C.   Argument

Defendant's motion for summary judgment is without merit and should be denied.

### i.   The Standard of Review for Summary Judgment Motions.

Federal Rule of Civil Procedure 56 and the authorities interpreting it have set a high standard for the granting of summary judgment. Defendant cannot satisfy that standard given the facts adduced in the instant case.

Pursuant to Fed.R.Civ.P. 56(c) summary judgment is appropriate only in cases "... where there is no genuine issue of material fact for the jury to decide." *Coolspring Stone Supply v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3rd Cir. 1993). Summary judgment may be granted only when there is no dispute as to an issue of material fact and the moving party is

entitled to judgment as a matter of law. *See e.g. Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 347 (3rd Cir. 2007).

In response to a motion for summary judgment, the nonmoving party must demonstrate the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986). The burden always remains on the moving party, however, to show that a rational trier of fact could not find for the non-moving party and that there is thus no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986). Defendant cannot meet that burden.

In ruling on a motion for summary judgment, the Court must accept and believe the evidence of the non-moving party (herein, the Plaintiff) as true, and must not weigh or consider the credibility of witnesses. *Anderson, supra,* 477 U.S. at 248-52. The non-moving party's evidence must be believed as true on summary judgment, and any and all doubts must be resolved in that party's favor. *Eastman Kodak Co. v. Image Technological Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 2076 (1992). On summary judgment, where the non-moving party's evidence contradicts the movant's evidence, then the non-movant's evidence must be taken as true. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3rd Cir. 1992), *cert. denied,* 507 U.S. 912, 113 S. Ct. 1262 (1993).

As will be demonstrated *infra,* Plaintiff has adduced ample evidence to allow her claims to proceed to trial.

  **ii.**  ***Plaintiff (like virtually all discrimination plaintiffs) does not have direct evidence of discrimination***

Like most plaintiffs who come before the federal courts with discrimination claims, Plaintiff has no direct evidence of discrimination. This is, of course, not unusual, and such evidence is never required. As the Third Circuit Court of Appeals has noted:

In today's climate of public opinion, blatant acts of discrimination -- the true "smoking guns" -- can easily be identified, quickly condemned and often   rectified       in the particular settings where they occur. Much of the             discrimination that remains resists  legal attack exactly because it is       so difficult to prove.  *Discrimination victims often  come to the legal process       without   witnesses   and   with   little   direct   evidence indicating the  precise nature of the wrongs they have suffered.* That is one of the  reasons why our       legal system permits discrimination plaintiffs to [] prove    [their]   case[s]    by direct or       circumstantial evidence.

*Jackson v. University of Pittsburgh*, 826 F.2d 230, 235 (3d Cir. 1987), *cert.       denied*, 484    U.S. 1020, 98 L. Ed. 2d 680, 108 S. Ct. 732 (1988)(emphasis      added,       internal quotations and citations omitted).

Given the typical lack of direct evidence of discrimination, Plaintiff must proceed under the *McDonnell-Douglas* framework and/or the *Price-Waterhouse* "mixed motive" framework set forth *infra*.

### iii.    *Plaintiff Can Show Defendant's Failure to Hire Her Was Pretextual Under Two Different Theories*

Based on the facts adduced during discovery, Plaintiff can establish a claim of race discrimination under both a "mixed motive" theory and a "pretext" theory (although Defendant discusses only the "pretext" theory, and then only in passing).  A plaintiff is not required to choose between these two theories of liability at the summary judgment stage. *See Armbruster v. Unisys Corp.*, 32 F.3d 768, 781 n.17 (3d Cir. 1994).   The Plaintiff's case must go forward if her claim would survive under *either theory.*   *Id.* "[B]efore granting summary judgment and removing a case from the hands of a jury, the District Court ought to consider whether a plaintiff's claim would survive under either a pretext or *Price Waterhouse* theory." *See Hankins v. City of Philadelphia,* 189 F.3d 353, 364 n.6 (3d Cir. 1999).

### 1.    *Price Waterhouse* - "Mixed Motives"

The Court may analyze this matter as a "mixed-motive" case under the framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989).

In such cases, the burden-shifting analysis of *McDonnell- Douglas* is not used.  As the United

States District Court for the Western District of Pennsylvania noted in *Black v. Healthcare*

*Services Group, Inc.*:

> *Price Waterhouse* established a two part analysis for a court to examine discrimination cases. First, a plaintiff must present sufficient direct evidence to show that [the plaintiff's protected class] was a motivating factor in the employment decision. Next, once the plaintiff presents this direct evidence, both the burden of production and the burden of persuasion shift to the employer. The burden of persuasion is a heavier burden than the burden of production under the *McDonnell Douglas* analysis in which the defendant must simply set forth a legitimate non-discriminatory reason for the discharge to satisfy its burden. Under *Price Waterhouse,* an employer must present sufficient evidence to leave *no room* for the fact finder to infer that the employer in fact discriminated or retaliated against the plaintiff to satisfy the burden of persuasion.  Therefore, to succeed on its motion for summary judgment, Defendant must prove that a rational jury would find that Defendant *would have discharged Plaintiff []* *independent of the alleged [] discrimination.*
>
> *Black*, 2007 U.S. Dist. LEXIS 59480 at *9-10 (W.D. Pa. August 13, 2007)(emphasis added).

Significantly, Plaintiff does not need to produce direct evidence of discrimination to

warrant analysis under the "mixed motive" framework.  *See Desert Palace, Inc. v. Costa*, 539

U.S. 90, 92, 123 S. Ct. 2148, 156 L.Ed. 2d 84 (2003).

As the *Black* court noted, "Courts have been reluctant to grant summary judgment in

mixed motive cases." *Black, supra,* 2007 U.S. Dist. LEXIS 59480 at *9-10, *see also Adler v.*

*Madigan,* 939 F.2d 476, 479 (7th Cir. 1991) (finding that mixed motive situations " . . . are

ordinarily not grist for the summary judgment mill"); *Burns v. Gadsden State Community*

*College,* 908 F.2d 1512, 1519 (11th Cir.1990) ("at the summary judgment stage, an employer can

prevail on this issue only if the record evidence that its employment decision was not based on

discrimination is so strong that a reasonable trier of fact must so conclude").

As will be discussed *infra,* the evidence in this case is not so strong that a reasonable trier of fact cannot conclude discrimination played *no role* in the decision not to hire Plaintiff for an open position.

### 2.  *McDonnell Douglas* – "Pretext"

Even if the Court were to analyze this matter pursuant to the well-established *McDonnell Douglas* framework, *Fuentes v. Perskie,* 32 F.3d 759 (3d. Cir. 1994) allows Plaintiff to meet her burden of proof on the issue of race discrimination if she shows that the employer's proffered reason for failing to hire her is sufficiently implausible, incoherent, and unworthy of credence.

As the Third Circuit Court of Appeals has noted:

> Briefly summarized, the *McDonnell Douglas* analysis proceeds in three stages. First, the plaintiff must establish a *prima facie* case of discrimination. If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [action in question]. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

> *Jones v. School Dist. Of Philadelphia,* 198 F.3d 403, 410 (3rd Cir. 1999) (citing *McDonnell Douglas,* 411 U.S. at 802).

Under the *McDonnell-Douglas* framework, a plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons for the employer's decision, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary

judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3rd Cir. 1994).

Based on the record in this matter, Plaintiff can set forth evidence that Defendant's reason for failing to interview or hire her for one of the numerous open positions was pretextual.

### iv.     *Plaintiff can establish a prima facie case under McDonnell-Douglas*

To establish a *prima facie* case of race discrimination under either Title VII or section 1981, a plaintiff must establish four general elements: (1) that she is a member of a protected class; (2) that she was qualified for the job; (3) that she did not receive the job despite those qualifications; and (4) after the Plaintiff's rejection, the job remained open and the employer sought applicants with the plaintiff's qualifications. *See, e.g., Matcak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933,938 (3d Cir. 1997). As the *Matcak* Court noted, however, " . . . [y]et, the *McDonnell Douglas* Court cautioned that there is no rigid formulation of a *prima facie case* and the requirements may vary with "differing factual situations." *Id.*

Plaintiff is quite clearly a member of a protected class. She is African American. There is also no question that she was qualified for the job as judicial secretary. This issue also is not in dispute. She was judicial secretary for 26 years for Judge Horace A. Davenport and Judge Corso believed that Naomi would fit the criteria with regard to her technical skills as a judicial secretary. Even Michael Kehs, who was hostile to Naomi from the beginning, admitted that it was not Naomi's lack of secretarial skills which had anything to do with the determination that she would not be "a good fit". Kehs Dep. 96:13-19. It is also glaringly apparent that Naomi did not receive the job of floating judicial secretary despite her stellar qualifications.

According to Carol Dillon, Naomi was excluded from the judicial secretary's job from the very beginning, almost at the very point when she reapplied for employment with the

20

Montgomery County Court of Common Pleas.  When Judge Davenport called Judge Corso and Judge Corso was in conference with Michael Kehs and Carol Dillon, the decision was made at that point, according to Carol Dillon, not to consider Naomi for a judicial secretary position despite her request on her application that she so be considered.  Even though there was no vacancy for a floating judicial secretary at the time, Naomi was excluded from the outset.  There was no basis to exclude her.  She had not yet undergone any probationary period as a tipstaff.  There were no Judges who had indicated they wished to exclude her from their Chambers or Courtrooms.  She had no adverse employment information in her personnel file.  She was never disciplined or reprimanded or put on any verbal or written warning in all of her 26 years as a Montgomery County employee.

Yet, from the very beginning of Naomi's attempts to gain employment as a judicial secretary, she was immediately excluded and precluded.  In July 2006, the Defendant posted the position of an "on-call substitute judicial secretary" and offered the position to Jenny Hayden without even informing Naomi.  In the Fall of 2006, Naomi applied again for a judicial secretary floater position and was summarily rejected by Michael Kehs and Carol Dillon.  Judge Corso told Carol Dillon to give Naomi a "cursory interview".  Carol Dillon did so, with an interview that lasted only about 5 minutes.

Defendant never had any intention of ever hiring Naomi as a judicial secretary for an on-call floater position.  Michael Kehs admits as much in his deposition at 85:21 - 86:1 and Carol Dillon testified that when Naomi's original application, in November of 2005, came across her desk, and she and Michael Kehs and Judge Corso discussed it, they all came to the same conclusion that Naomi would "not be a good fit" for a judicial secretary.

In March or April 2007, Naomi discovered that two other secretaries, with less qualifications than she, had been hired as floating judicial secretaries.   They were both Caucasian.   Marie Coonahan was a sister of the Assistant District Attorney and Joyce McCafferty had been a tipstaff and a secretary in the Youth Department and was married to a tipstaff.

To add insult to injury, Joyce McCafferty had not even applied for the part-time on-call job but had been approached by Court Administration to see if she would be interested in the part-time on-call position.   Naomi, despite her 26 years as a judicial secretary, was entirely ignored and continued to receive minimal wages while the less qualified Caucasian women were receiving maximum wages per hour. Satterwhite Dep. 106:6-11.   In this regard, Naomi is able to satisfy the last prong of her *prima facie* case under *McDonnell-Douglas*.   After she was rejected, the job remained open and the Defendant sought applicants with the Plaintiff's qualifications. With respect to the vacancy in November 2006, three Caucasian women, who did not have the same experience as Naomi, entered the second round of interviews, this time with President Judge Corso.   Naomi got a courtesy interview, which obviously meant Defendant was simply going through the motions to appease Naomi but never had any serious intention of considering her.

There were vacancies in early 2007 but Naomi did not know about them because she was never told about them and never considered for them.   Instead, as stated, the Defendant approached Joyce McCafferty and asked her if she would be interested in the very position Naomi had consistently requested.   Naomi brought this to the attention of Court Administration in her letter, attached hereto and incorporated herein as Exhibit "16," in which she specifically stated how the Defendant was hiring other floaters but nobody was contacting her, despite her continued interest in the floater (part-time) position.

It is clear, from the foregoing that Plaintiff can easily establish a *prima facie* case under *McDonnell-Douglas*.

### v.     *Plaintiff can establish the reason for her rejection was pretextual*

### 1.     <u>Prejudice from the Outset</u>

Naomi applied for the tipstaff/floating judicial secretary position in November 2005. Shortly thereafter, Judge Davenport called Judge Corso to recommend Naomi for a tipstaff position. Despite the fact that there was no vacancy, at that time, for a floating judicial secretary position, Carol Dillon testified that Naomi was immediately precluded from even being considered as a judicial secretary on or about November 13, 2005. This preclusion had no basis. Naomi's only record, at that time, was her 26 years as of outstanding service as a judicial secretary for a highly respected former Judge (Judge Davenport).

When Naomi's application came in, apparently Michael Kehs informed President Judge Corso that Naomi had now reapplied to the Court for a position.  Naomi is entitled to an inference that Michael Kehs spoke to the President Judge about Naomi's application so that he could blackball her from the outset.  There is simply no other logical inference given that Michael Kehs was speaking with the President Judge simply because Naomi had resubmitted her employment application. The explanation that Michael Kehs informed President Judge Corso about Naomi's application so that Judge Corso would be "in the know" is disingenuous and unbelievable given what happened to Naomi shortly thereafter and on an ongoing basis, with respect to her never being considered for or being given a floating judicial secretary's position until April 2008.

There is general agreement in the federal courts that a plaintiff can establish liability by showing that a decision-maker did nothing more than "rubber stamp" a recommendation made

by an employee motivated by unlawful animus or that a decision-maker was acting as an unwitting dupe or "cat's paw" for such an employee. *See, e.g., EEOC. v. BCI Coca-Cola Bottling Co. of LA.*, 450 F.3d 476, 484-85 (10th Cir. 2006) (discussing cases). The United States Court of Appeals for the Third Circuit has indicated that its own case law allows plaintiffs to recover if they can show that a biased non-decision-maker "influenced or participated" in the adverse employment decision. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001("[u]nder our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate") (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995)).

It was fine for Naomi to work as a secretary for an African American Court of Common Pleas Judge for 26 years but, when she applied to the Court again after 26 years of stellar achievement, she was immediately precluded from a position *before one was even available.* This was apartheid at its worst. She was the only African American judicial secretary ever to be employed full-time by the Court of Common Pleas and this unfortunate statistic continues to this day.

### 2.    The Pretextual Reason of Naomi "not being a good fit"

What were the alleged reasons for the alleged conclusion that Naomi was not going to be a "good fit" as a judicial secretary? The only example that Carol Dillon could quote about Naomi not being a rule follower was that *on a single occasion* Naomi had put in 1 ¼ more hours as a secretary then she should have and requested compensation for her "extended time". Dillon Dep. 17:3-23; 18:1-23. This does not show rule breaking. Rather, it shows just the kind of dedication Judge Davenport indicated that Naomi possessed. Naomi was getting the Judge's work done and could not complete it in 6 ¾ hours. She needed eight. Once.

Judge Richard Hodgson could never articulate any specifics regarding any problems with Naomi's work.  Hodgson Dep. 14:12-15.  Michael Kehs said that it was Judge Corso who said that Naomi would not be a good fit.  Kehs Dep. 48:9-12.  However, Judge Corso denied any specific knowledge about Naomi.  Corso Dep. 43:14-44.  Judge Corso also had no opinion or knowledge about Naomi being any kind of problem or being a rule breaker or being troublesome in any way.  Corso Dep. 13:6-11.  Michael Kehs stated that Naomi's problem was that she would do things in her own way, including an attitude that was expressed in her writings to the paymaster and everything else.  This issue however, is addressed by Judge Davenport in his letter and his affidavit wherein Naomi's advocacy for a chair rail and other appropriate furnishings might have caused problems with Court Administration.  Exhibit "1".

Equally pretextual are the allegations that Naomi had problems while she was on probation as a tipstaff.  *There were no documented problems.*  Naomi took the initiative and complained about a racially offensive joke and may have been retaliated against as a consequence.  She was also treated with very significant disrespect by the very person who was supposed to chaperone her, Norma Prinzo.  Carol Dillon agrees that Norma Prinzo was not "warm and fuzzy" but could have been rude and abrupt.  Dillon Dep. 44:7-12.  Apparently, no one ever wrote up Norma Prinzo for her churlish attitude and for her failure to take care of Naomi.  In any event, the so-called "criticism" of Naomi by Dolly Strizziere was simply that Naomi informed the tipstaffs that she was the former secretary for Judge Davenport for many years and that she knew the Courthouse well and was also aware of all the functions of the Court system.  This was all perfectly true.   Michael Kehs agreed that Naomi was indeed more knowledgeable about certain things than everybody else given her past experience.  Kehs Dep. 104:14-105:2.   The other criticism by Dolly Strizziere was that Naomi should be "more supportive" to her "fellow workers" and apparently acted independently of everyone else and

25

gave the impression that she was more knowledgeable than everyone else. In fact, Naomi was indeed more knowledgeable, and this was confirmed by Michael Kehs, by Judge Horace Davenport and by Carol Dillon. Dillon Dep. 78:20-79:5.

If there were problems during Naomi's probationary period, how is it she successfully completed her probationary period as a tipstaff and that it was never extended. Naomi was never given any verbal warning or written warning and the tone of Dolly Strizziere seems to reflect more jealousy and pique than any genuine criticism.

However, Defendant uses Dolly Strizziere's opinion of Naomi to accelerate her problems into some kind of bad attitude that Naomi apparently manifested as a tipstaff and this invented and undocumented bad attitude somehow precludes her (as if she wasn't precluded before) from being a part-time judicial secretary. Dillon Dep. 70:8-20. Michael Kehs refers to "other incidents that were documented in terms of her conduct as a tipstaff" but never states what documented incidents he is referring to or where they can be found. Kehs Dep. 61:18-62:1. The truth of the matter is there is no documentation of any misconduct or bad attitude by Naomi anywhere.

### 3.      The lie of not being a Rule Follower

The accusation against Naomi that she was not a rule follower is also entirely without merit. First, it is axiomatic that Naomi could not possibly have functioned for 26 years as a judicial secretary for a Judge of the Court of Common Pleas without zealously following all the rules. Judge Davenport, in his letter and affidavit, makes it clear that Naomi was indeed a rule follower. Also, what are the rules she did not follow? The only one Carol Dillon is able to find is that she worked 8 hours instead of 6 ¾ hours on one occasion. The only rule that Michael Kehs was able to discuss was that Naomi would do things in her own way. He never reprimanded her for it. He never advised her that the way she went about things was not in

keeping with what was expected with the Court. How serious could Naomi's alleged rule breaking and independent spirit have been if over the course of 26 years she was never reprimanded, advised, warned, or questioned about her conduct? Kehs Dep. 56:21-57:10. Judge Corso did not know of Naomi being any kind of problem, being a rule breaker, or being troublesome in any way. Corso Dep. 13:6-11. He did recall something along the lines that Carol Dillon, Michael Kehs or himself might have said that Naomi was not a rule follower. Corso Dep. 29:13-20. He also stated that there were apparently "difficulties" during Naomi's training and services as a tipstaff but he does not know what they were and does not know the timing. Corso Dep. 30:21-23.

It follows that the so-called reasons for denying Naomi the part-time judicial secretary's position (that she was "not a good fit" because she was a "rule breaker") and because she had problems during her probation period as a tipstaff, are entirely without credence because there is no credible factual support for them.

### 4.    Defendant's witnesses contradict each other and are not worthy of credence

Further, Defendant's witnesses are all over the place with regard to their testimony and contradict each other in very significant ways. Specifically, Carol Dillon swears that Judge Corso said that as a tipstaff, Naomi would not be able to "stir the pot". Judge Corso denies ever saying that. Judge Corso also never said that Naomi would be "a better fit" in a tipstaff position than she would in a judicial secretary position. However, Michael Kehs says that his understanding that Naomi would not be a good fit came from Judge Corso. Kehs Dep. 48:9-12. Kehs testified that it was Judge Corso who told Kehs that it was his experience with Naomi in a general way which indicated difficulty at times dealing with Naomi and, as a consequence, a judicial secretary position would not be an appropriate fit. Kehs Dep. 48:13-21. Judge Corso

denies saying any such thing.  He does not even recall meeting Michael Kehs to discuss Naomi's application as an on-call secretary.  Corso Dep. 20:24-21:6.

Judge Corso did not even raise the issue of Naomi being a better fit in a tipstaff position than she would in a judicial secretary position.  Corso Dep. 36:23-37:13.  Judge Corso did not even have specific knowledge about Naomi, he just had general knowledge about her.  Corso Dep. 43:14-44:19.  Further, *none of the information he had was negative.*  Corso Dep. 44:22-45:1.

There is also significant controversy over the alleged Judges who apparently would not allow Naomi to work for them.  Information on this comes only from Dolly Strizziere who clearly, for a host of reasons, was jealous of Naomi and angry at the fact that Naomi found a joke circulated by one of Strizziere's closest friends to be racially offensive.

It was Dolly Strizziere who said that Judge Nicholas, Tressler and Vogel did not wish to have Naomi in their Courtrooms, *but there is nothing of that sort in* writing and Judge Nicholas clearly allowed Naomi in his Courtroom and in fact gave her a stellar review.  Judge Vogel also allowed Naomi into his Courtroom and spoke to Naomi directly, as set forth in Naomi's affidavit which describes the distress he felt at having been tarnished by the unfair accusation that somehow he had excluded Naomi from working for him.  Not only is there significant evidence that Judge Nicholas and Judge Vogel never prevented Naomi from working in their Courtroom but there is evidence to the contrary.  Also, Judge Corso, the President Judge at the time, had no idea why Judges Nicholas, Tressler and Vogel apparently did not want Naomi in their courtrooms.  Corso Dep. 24:10-15.  Also, Carol Dillon, the Deputy Court Administrator, never got an answer as to why Judges Tressler, Nicholas and Vogel allegedly did not want Naomi in their Chambers.  Dillon Dep. 74:1-10.

Apart from the hearsay of Dolly Strizziere, as apparently communicated to Carol Dillon through Sonny Rodgers, another employee, *Defendant has not produced one whit of credible evidence that Naomi was in fact ever excluded from any of these Judges' Courtrooms or Chambers.* There is in fact, documented testimony to the contrary that at least Judges Nicholas and Vogel never excluded Naomi from either their Chambers or their Courtrooms.

Therefore, in light of the foregoing, the proffered reasons for the Defendant's decision not to give Naomi a floating judicial secretary position are discredited by both circumstantial and by direct evidence. Defendant's proffered reasons for failing to hire Naomi are so sufficiently implausible, incoherent and unworthy of credence, that the pretext requirements of the *McDonnell-Douglas* framework are well satisfied. There is also a great deal of evidence, both circumstantial and direct, that discrimination was more likely than not the motivating or determinative cause of Naomi's adverse employment action.

### 5.    The Final Blow

Finally, the very fact that Naomi *was given a position* as a judicial secretary substitute on March 26, 2008 (after she complained she had not been given the position because of her race) gives the lie to everything that the Defendant did before to prevent her from getting that position. If Naomi was qualified as a judicial secretary substitute on March 26, 2008, why was she not qualified before? Perhaps the answer to this question is that attorney Mark Turetsky, Esquire, then attorney for Naomi, called Michael Kehs in February 2008 and accused the Court of racial discrimination in its hiring practices toward Naomi. Naomi was hired as a judicial secretary substitute a month later. How could that happen given all the alleged "problems" she had before? Didn't she have a bad attitude? Weren't there complaints about her? Hadn't Judges excluded her from their Courtrooms? How could she now be given a judicial secretary job after all the vacancies for which she was passed over and about which she was neither informed not

got the chance to interview?  The fact that the Defendant eventually hired Naomi in the very position in which she had previously been consistently excluded, after her attorney complained about race discrimination would be sufficient, without more, to sink Defendant's Summary Judgment Motion.

### 6.    The Statistical Evidence

The statistical impact of the under-representation of African-Americans in the Defendant's judicial secretarial workforce is also significant.  This factor is of significant relevance in the instant case because Plaintiff is entitled to use statistical evidence to show that Defendant's articulated nondiscriminatory reason for its employment decision regarding her (in this case, its failure to hire for a secretarial position) is pretextual. *See McDonnell Douglas  v. Green,* 411 U.S. 792, 804-05, 93 S. Ct. 1817, 1825-26, 36 L. Ed.2d 668 (1973).  Indeed, " . . . the same statistical evidence that a plaintiff introduces to establish a *prima facie* case may be considered by the trier of fact on the issue of whether the defendant's explanation for the employment decision is pretextual." *Diaz v. American Telephone and Telegraph,* 752 F.2d 1356, 1363, n. 8 (7th Cir. 1985)(*citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 255 n. 10, 101 S. Ct. at 1094 n. 10).

Statistical data may properly be used to establish a general discriminatory pattern in an employer's practices. Such a discriminatory pattern " . . . is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision[s] at issue." *Diaz, supra,* 752 F.2d at 1363.  In some cases, statistical evidence *alone* may be sufficient to establish a *prima facie* case. *See O' Brien v. Sky Chefs, Inc.,* 670 F.2d 864, 866 (9th Cir. 1982)("[s]tatistical data is one way to establish a *prima facie* case.")

Statistical evidence " . . . is helpful in showing that an employer's articulated reason for the employment decision is pretextual . . . and in some cases  . . . may be essential." *Diaz, supra.*

The imbalances revealed by such evidence are probative because they are often indicative of " . . . a telltale sign of purposeful discrimination . . .". *Id.*

Indeed, in many cases, the only available avenue of proof is the use of statistics " . . . to uncover clandestine and covert discrimination by the employer or union involved." *See Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S. Ct. 1843, 1857 n. 20, 52 L.Ed. 2d 396 (1977)(quoting *United States v. Ironworkers Local 86,* 443 F.2d 544, 551, *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed. 2d 367 (1971).

Where, as here, the employment positions at issue involve skills many persons either possess or can learn, the relevant labor market is virtually identical to the composition of the general work force. The United States Supreme Court has found that statistical comparisons between the composition of the defendant's employees in the position and the composition of the general work force can be *highly probative. See Hazelwood School Dist. v. United States,* 433 U.S. 299, 308 n. 13, 97 S. Ct. 2736, 2742 n. 13, 53 L. Ed. 2d 768 (1977); *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 337-39, 97 S. Ct. 1843, 1855-56, 52 L. Ed.2d 396 (1977). Gross statistical disparities between the composition of an employer's work force and the composition of the general population in a proper case may constitute, in and of themselves, *prima facie* proof of a pattern or practice of discrimination. *Hazelwood School Dist., supra,* 433 U.S. at 307-08, 97 S. Ct. at 2741-42; *Int'l Brotherhood of Teamsters, supra,* 431 U.S. at 339, 97 S. Ct. at 1856.

In the instant case, Plaintiff can demonstrate that African-Americans are underrepresented in Defendant's judicial secretary workforce.

Carol Dillon testified at her deposition that, as of 2006, Defendant employed 36 tipstaves. Dillon Dep. at 38:16-24. Four of them (Plaintiff, "Pat", "Pearly Mae", and one other female Dillon could not remember by name) were African-American. *Id. at* 39:5-13 and

31

14.  In other words, roughly 8-9 percent of the tipstaves were African-American.  This is closely in line with the overall population of African-Americans in the county.  The 2000 Census figures for Montgomery County indicate that 7.5 percent of the population was African-American.  It rose to 8.5 percent by 2009.  *See* attached Exhibit 21.  The Court may properly take judicial notice of U.S. Census figures.  *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,* 383 F.3d 110, 127n.2 (3d Cir. 2004).  Such notice may be taken at any stage of a proceeding.  *See* Fed.R. Evid. 201(f).

As to Defendant's judicial secretary workforce, Dillon testified that only *one* secretary (out of either 21 or 26, since Dillon's testimony is somewhat confusing on the total number of secretaries) was African-American.[1]  Dillon Dep. at 48 and 49:16-19.   Therefore, the percentage of African-American judicial secretaries is between 4.1 percent (if using the number 26) and 4.7 percent (if using the number 26) – *half* the County population totals for African-Americans.

Does this show an endemic problem in judicial secretary hiring?  Yes.

Defendant's EEO-4 reports for the years 2005 and 2007 (such reports are only submitted every two years), attached hereto as Exhibit 22 and Exhibit 23, demonstrate that the composition of Defendant's overall workforce is *actually higher* than the county population of African-Americans.

A review of Defendant's 2005 EEO-4 report (Exhibit 22 hereto) indicates that 118 African-American males and 295 African-American females (a total of 413) were employed – out of 3,271 full-time county employees.  This is roughly 12.6 percent of Defendant's workforce.  As to non-full-time employees, the Defendant employed 17 African-American

---

[1] Dillon's uncertainty as to the number does not affect Plaintiffs argument since it seems clear from her testimony that none of Defendant's part-timers were African-American. *See* Deposition of Carol Dillon, p. 48, lines 14-21 and p. 49. Lines 16-19.  Plaintiff was seeking  a part-time position.

males and 36 African-American females (a total of 53) out of 429 non-full-time employees. This is just roughly 12.4 percent.  New hires of African Americans for 2005 year included 14 African-American males and 36 African-American females out of 295 total new hires.  This is just over 17 percent.

A review of Defendant's 2007 EEO-4 report (Exhibit 23 hereto) indicates that the same numbers of full-time African-Americans were employed in 2007 out of the same total of full-time and part-time employees.[2]

These overall statistics mirror (or exceed) the African-American population of Montgomery county.  But Dillon's testimony as to the low number of African-Americans in judicial secretary positions demonstrates that African Americans are woefully underrepresented in that particular position – lending even more credence to Plaintiff's position that there is are racially-based reasons for her non-hiring as a judicial secretary.

**D.**   **Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

TIMOTHY M. KOLMAN AND ASSOCIATES

By:   /s/ Timothy M. Kolman, Esquire TMK 5921
Timothy M. Kolman, Esquire
Wayne A. Ely, Esquire
Attorneys for Plaintiff
Timothy M. Kolman and Associates
414 Hulmeville Avenue
Penndel, PA  19047

August 30, 2010

---

[2] The 2005 and 2007 numbers seem oddly identical, but these are the reports produced by Defendant.

33