# EXHIBIT "2"

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 09-1024


| | | |
|---|---|---|
| NAOMI C. SATTERWHITE, | ) | DEPOSITION UPON |
| | ) | |
| Plaintiff, | ) | ORAL EXAMINATION |
| | ) | |
| - vs - | ) | OF |
| | ) | |
| MONTGOMERY COUNTY and | ) | NAOMI C. SATTERWHITE |
| MONTGOMERY COUNTY COURT | ) | |
| OF COMMON PLEAS, | ) | |
| | ) | MAY - 5 2010 |
| Defendants. | ) | |
| - - - - - - - - - - - - - | ) | 14180-5644 |


TRANSCRIPT OF DEPOSITION, taken by and
before DANIELLE N. COUGHLIN, Registered Professional
Reporter and Notary Public, at the offices of
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, 620
Freedom Business Center, Suite 300, King of
Prussia, Pennsylvania, on Thursday, April 15, 2010,
commencing at 10:03 a.m.


ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA  19103
(215) 564-1233

NAOMI C. SATTERWHITE

**2**

```
1 APPEARANCES:
2
3   TIMOTHY M. KOLMAN AND ASSOCIATES
      BY: JAMIE JAMISON, ESQUIRE
4       414 Hulmeville Avenue
        Penndel, Pennsylvania 19047
5        Attorneys for the Plaintiff
6
7   MARSHALL, DENNEHEY, WARNER, COLEMAN &
    GOGGIN
8   BY: JOHN P. GONZALES, ESQUIRE
        620 Freedom Business Center
9       Suite 300
        King of Prussia, Pennsylvania 19406
10       Attorneys for the Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
1              I N D E X
2
    WITNESS                      PAGE
3
    NAOMI C. SATTERWHITE
4
5   By: Mr. Gonzales            4
6
7
           E X H I B I T S
8
9  NUMBER      DESCRIPTION       MARKED ATTACHED
10 P-1   March 27, 2006 Letter     59     161
11 P-2   March 27, 2006 Memo       70     162
12 P-3   Letter                    85     163
13 P-4   November 16, 2006 Letter 100     164
14 P-5   October 31, 2007 Letter  111     165
15 P-6   Employment Application   120     166
16 P-7   November 1, 2007 Letter  130     167
17 P-8   November 13, 2007 Letter 134     168
18 P-9   March 26, 2008 Letter    141     169
19 P-10  March 26, 2008 Letter    142     170
20 P-11  April 13, 2008 Letter    143     171
21 P-12  First Amended Civil      144     172
         Action Complaint
22
   P-13  Charge of Discrimination 147     173
23
24
```

**4**

```
1              (By agreement of counsel, the
2    sealing, filing, and certification of the
3    transcript has been waived; and all
4    objections, except as to the form of
5    the question, have been reserved until
6    the time of trial.)
7
8              NAOMI C. SATTERWHITE, after
9    having been duly sworn, was examined
10   and testified as follows:
11
12 BY MR. GONZALES:
13 Q      Ms. Satterwhite, my name is John
14 Gonzales.  I represent Montgomery County, and we're
15 here today to take your deposition, which is my
16 opportunity to ask you questions under oath
17 regarding any information that you might have that
18 would be relevant to your lawsuit.
19        I know from your extensive background and
20 history as both a legal secretary and a judicial
21 secretary that a lot of this is going to be review,
22 and you certainly understand what a deposition is.
23 A      Um-hmm.
24 Q      But, again, I'm just going to ask you a
```

**5**

```
1 couple of questions on the record to make sure that
2 the record is clear.
3 A      Okay.
4 Q      First, before I begin, I have a couple of
5 instructions.  The first is to give a verbal
6 response to my questions so the court reporter can
7 take down your answers.  Do you understand that
8 instruction?
9 A      Yes.
10 Q      All right.  Second is, if you don't hear
11 or understand a question that I ask, just ask me to
12 rephrase it, because if you do answer the question,
13 I will assume that you heard it and that you
14 understood it.  Do you understand that instruction?
15 A      Correct.  I do.
16 Q      Okay.  Is there any reason why you would
17 not be able to testify truthfully today?
18 A      None.
19 Q      Have you taken any medication in the last
20 24 hours?
21 A      None.
22 Q      Now, it's my understanding that within
23 the last week or two, you were in a -- in an
24 automobile accident; is that correct?
```

2 (Pages 2 to 5)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

6

1 A      Correct.
2 Q      Now, in that accident, did you suffer any
3 injuries?
4 A      Yes.
5 Q      And can you just tell me briefly what
6 those injuries were?
7 A      The air bag exploded, hit my head and my
8 knees.
9 Q      Did you go to the hospital?
10 A      Yes.
11 Q      Were you treated at the hospital?
12 A      X-rayed, told to take Tylenol, and
13 released.
14 Q      Okay.  Did they tell you whether you
15 suffered any type of head injury?
16 A      Montgomery did not take a CAT scan or
17 MRI, and that evening I began upchucking, didn't
18 sleep well that night.
19      The next morning, I had two incidences
20 where I got light-headed, so I called my family
21 physician.  They had me to come in at 7:30 that
22 evening, and Dr. Zeitzer immediately sent me to
23 Mercy Suburban to have a CAT scan, and the results
24 of the CAT scan was that I do have a slight

7

1 concussion.
2 Q      Okay.  Now, does that concussion -- did
3 you have any physical symptoms?  You talked about
4 the nausea and you weren't able to sleep the day of
5 the accident.  Since you were diagnosed with having
6 a slight concussion --
7 A      I've had --
8 Q      -- any other symptoms that you've
9 experienced?
10 A      Headaches.
11 Q      And do you still experience those
12 symptoms today?
13 A      Not right now.
14 Q      Okay.  When was the last time you were
15 experiencing a headache?
16 A      Last night.
17 Q      And did you take anything for it?
18 A      No, went to bed.
19 Q      Have you suffered from any loss of memory
20 from this accident?
21 A      No.
22 Q      And did you ever lose consciousness?
23 A      No.
24 Q      And you can hear what I'm saying?

8

1 A      Yes.
2 Q      All right.  Can you tell me where you
3 live?
4 A      733 South Park Avenue, Audubon, PA
5 19403.
6 Q      And who do you live there with?
7 A      My husband.
8 Q      And his name is?
9 A      Robert; also my daughter-in-law and
10 grandson.
11 Q      How many children do you have?
12 A      Two.
13 Q      And what are their names and their ages?
14 A      Oldest is Robert, Jr., age 50.  Second is
15 Kyle C., age 44.
16 Q      And your daughter-in-law's name is what?
17 A      Irene.
18 Q      And who is -- was she married to or is
19 she married to?
20 A      She is no longer married to Robert.
21 Q      Okay.  And how old is your grandson?
22 A      He'll be 17 the 27th of this month.
23 Q      Now, is your husband -- is he working, or
24 is he retired?

9

1 A      Retired.
2 Q      And what did he do before he was retired?
3 A      He worked in construction.
4 Q      How long has he been retired?
5 A      1995.
6 Q      What is your date of birth?
7 A      10/5/36.
8 Q      And your Social Security number?
9 A      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.
10 Q      Now, you are currently employed by the
11 Montgomery County Court or Montgomery County; is
12 that correct?
13 A      Correct.
14 Q      And what is your current position today?
15 A      Floating on-call secretary.
16 Q      Is that a full-time or part-time
17 position?
18 A      Part-time.
19 Q      Do you have any set hours?
20 A      Just the courthouse hours.
21 Q      So when the courthouse calls you and
22 tells you there's a need, that's when you come in;
23 is that correct?
24 A      That's correct.

3  (Pages 6 to 9)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

10

1 Q      It's not like you have a set schedule
2 where you're going to work the first week of every
3 month or --
4 A      No.
5           MS. JAMISON:  Just make sure
6       when we go forward that you completely
7       let him finish asking the question before
8       you answer so she can take everything
9       down.
10          THE WITNESS:  Gotcha.
11 BY MR. GONZALES:
12 Q      Who is your direct supervisor?
13 A      Carol Dillon.
14 Q      Now, you and your attorney were kind
15 enough to provide me with documents concerning your
16 employment history and the issues that are at the
17 heart of this case, so to move things along, I'm
18 just going to ask you some brief questions about
19 your employment history, and just tell me if I have
20 it right or if I have it wrong.
21      It's my understanding that you worked for
22 Judge Davenport in his legal office from 1955 until
23 1976?
24 A      Correct.

11

1 Q      And then when Judge Davenport became a
2 judge, you then were his legal -- or excuse me --
3 his judicial secretary from 1976 until 2000?
4 A      Correct.
5 Q      And during that time, he was a sitting
6 judge.  Then he became a senior judge, and then he
7 retired; is that correct?
8 A      Correct.
9 Q      And all through that, the stages of his
10 judicial career, you were his secretary?
11 A      Correct.
12 Q      Then after you retired in 2000, you
13 returned to the county I believe in the summer of
14 2002; is that correct?
15 A      Correct.
16 Q      To work with Judges Vogel and Davenport?
17 A      Correct.
18 Q      And you worked -- that was a part-time
19 job, correct?
20 A      Yes.
21 Q      And then you worked for them until I
22 think the end of 2002 when Judge Davenport retired?
23 A      Correct.
24 Q      Then your next stint with the county

12

1 occurred when you were hired as a tipstaff, and I
2 think you started in January of 2006?
3 A      Correct.
4 Q      All right.  And you've been employed by
5 the county in a part-time basis ever since that
6 January of 2006, correct?
7 A      Correct.
8 Q      First as a tipstaff and now as the -- one
9 of the on-call secretaries?
10 A      Correct.
11 Q      When you were a full-time legal --
12 full-time judicial secretary for Judge Davenport --
13 so this would have been before 2000.
14 A      Um-hmm.
15 Q      -- did the courthouse have a system in
16 place to provide replacements or substitutes for
17 the secretaries when they were on vacation or out
18 sick?
19 A      At that time, they had I think it was one
20 person, and there were many instances when I would
21 call or email the Court Services and give them
22 ample time to know that I was in need of a
23 secretary for a prescribed period of time.
24      I would get a response that it would be

13

1 taken care of, and usually when I took vacation, it
2 would be for a two-week period of time.
3      I would leave and come back and find that
4 I had only had an assigned secretary for one day,
5 and for the other nine days, it would be a tipstaff
6 just sitting answering the phone.
7 Q      Did you ever have any discussions with
8 Judge Davenport about how that arrangement was
9 working out?
10 A      Oh, yes.  He was not happy.  As a
11 settlement conference judge, he had many, many
12 cases, and so, therefore, I would come back and
13 find nine days of cases where if he had five cases
14 a day, files piled up; and when I did the
15 settlement conference, I would schedule out four to
16 six weeks, and so, therefore, when I'd come back, I
17 would start scheduling again, and I would have all
18 the nine days of cases piled up there.
19      Then I would come in on that first day
20 and the pile would get greater, but I worked
21 through it because I was the kind of person that
22 did not do just 8:30 to 4:15.  If I stayed till six
23 o'clock, I always liked my next day to start out
24 fresh.

4 (Pages 10 to 13)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

14

1 Q       Now, after -- you said that during this
2 time period before 2000, that there was only one
3 substitute secretary?
4 A       That I knew of.
5 Q       That you were aware of.
6         Do you know whether that person was a
7 full-time employee or a part-time employee?
8              MS. JAMISON: Objection to the
9         form. You can answer.
10             THE WITNESS: I am not certain.
11 BY MR. GONZALES:
12 Q      Okay. Now, I want to fast-forward to the
13 fall of 2005, before you were hired as a tipstaff.
14 A      (Witness nods.)
15 Q   .  How did you find out, first of all, that
16 there was a tipstaff job or -- well, let's start
17 with the tipstaff. How did you find out there was
18 a tipstaff job available?
19 A      Well, I had -- I have to back it up.
20 Q      Um-hmm.
21 A      I had seen in the Times Herald where the
22 person -- Pat Veath and Debbie Rosetti had been
23 terminated, and I then learned several months
24 later -- that was, like, in July. Excuse me.

15

1        Then I learned several months later that
2 Carol Dillon had gotten the position. I picked up
3 the phone. I called Carol. I congratulated her on
4 having received the position, and I told her that I
5 thought I'd like to come back to the courthouse as
6 a tipstaff. She told me what to do, go get my
7 application, complete it, and bring it in. This, I
8 did.
9 Q      Where did you get the application from?
10 A      Human Resources.
11 Q      And who did you turn the application in
12 to?
13 A      Carol, and when I turned it in to her,
14 she asked me to have Judge Davenport to call Judge
15 Corso because they had a waiting list. This was in
16 November.
17 Q      November of 2005?
18 A      Yes. I then took a copy of the
19 application, went to Judge Davenport's home, spoke
20 to him, and told him what Carol had told me, have
21 Judge Corso call.
22       It so happened he was about to call Judge
23 Corso on another matter. When they completed that
24 discussion, Judge Davenport then asked Judge Corso

16

1 about me becoming a tipstaff because I was
2 interested, and he would like for him to support
3 it.
4 Q      Were you present when Judge Davenport --
5 A      Oh, yeah.
6 Q      -- made that phone call?
7 A      Yes.
8 Q      So you could hear what Judge Davenport
9 was saying on the phone?
10 A      Um-hmm, um-hmm.
11 Q      You have to say yes or no.
12 A      Yes. I'm sorry. Yes.
13 Q      Okay. Tell me what you heard.
14 A      Judge Davenport told Judge Corso that
15 Naomi is here, and she is interested in becoming a
16 tipstaff, and she has come because I was asked to
17 call you and that she's interested and that there
18 is a long waiting list, and I guess -- I don't know
19 what Judge Corso said, but that is when I heard
20 from Judge Davenport.
21 Q      When Judge Davenport finished the phone
22 call, did he tell you anything that Judge Corso
23 told him?
24 A      He said Judge Corso said okay.

17

1 Q      Okay. And what was the next thing that
2 happened with respect to the tipstaff job?
3 A      Okay. December the 21st, I got a phone
4 call asking if I was still interested in being a
5 tipstaff. My response was yes.
6 Q      Who called you?
7 A      It was Sunny.
8 Q      And what did you tell her?
9 A      Yes, and then she said I should report on
10 January the 2nd to the Court Services office.
11 Q      So this would have been January 2nd --
12 A      2006.
13 Q      Okay. Now, let me just stop you there
14 and ask you this: Prior to the -- to Carol being
15 promoted to the position in the Court
16 Administrator's office --
17 A      Yes.
18 Q      -- did you know who she was?
19 A      Oh, I had a very wonderful, I thought,
20 relationship with Carol. As a matter of fact,
21 after I retired in 2000, I had eight of the
22 secretaries at my home for a luncheon, and Carol
23 was one of the persons.
24 Q      Did you invite her, or she --

5  (Pages 14 to 17)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

18

1 A      I invited her, yes.

2 Q      And prior to her being promoted up to
3 Court Administration, about how often would you see
4 her around the courthouse?  I guess this would have
5 been back when you were working full-time with
6 Judge Davenport.

7 A      You'd see her all the time, in and out.

8 Q      And when she was -- she worked as a
9 judicial secretary as well, correct?

10 A     That's correct.

11 Q     And she worked for Judge Smyth, I
12 believe?

13 A     Smyth, correct.

14 Q     Did -- and she was cordial to you?

15 A     Always.

16 Q     And you were cordial to her?

17 A     Always.

18 Q     And did you ever hear her say anything
19 negative about you?

20 A     Never.

21 Q     Again, this is before she got into court
22 administration.

23 A     Never.

24 Q     And did you ever say anything negative

19

1 about her?

2 A      No.

3 Q      How about to any friends or coworkers?
4 Did you ever say anything negative about Carol to
5 others?

6 A      No.

7 Q      Okay.  Now, how about outside of work?
8 Did you ever socialize with Carol outside of work?

9 A      When we had Christmas parties, judicial
10 Christmas parties.

11 Q     And typically who would attend those
12 parties?

13 A     All of the judicial secretaries who would
14 come.

15 Q     Was that usually all of them, or were
16 there some that didn't?

17 A     There was some that did not come.

18 Q     And Carol was one of the ones that would
19 go?

20 A     Yes.

21 Q     And you would go?

22 A     Yes.

23 Q     Did you socialize with her at those
24 parties?

20

1 A      Yes.

2 Q      And was it a pleasant experience with
3 her?

4 A      Yes.

5 Q      Did you ever -- again, before she went
6 into court administration, did you ever hear Carol
7 make any racially derogatory comments about
8 African-American people?

9 A      No.

10 Q     Did you ever see Carol treat any
11 African-American individuals inappropriately or in
12 some type of discriminatory manner?

13 A     No.

14          MS. JAMISON:  Objection to the
15      form.  Can you just clarify the timing?

16          MR. GONZALES:  Yeah.  And this
17      would be again while she was a secretary
18      before she went into court
19      administration.

20          THE WITNESS:  No.

21 BY MR. GONZALES:

22 Q     Now, it's my understanding that Sunny is
23 Carol's assistant?

24 A     Correct.

21

1 Q      Now, did -- did you know Sunny when you
2 worked as a judicial secretary?

3 A      No.

4 Q      When was the first time you ever met
5 Sunny?

6 A      When I went there to be a tipstaff.

7 Q      Had you ever heard about -- anything
8 about Sunny be --

9 A      No.

10 Q     Wait a minute.

11 A     I'm sorry.

12 Q     Had you ever heard anything about Sunny
13 before you became a tipstaff --

14 A     No.

15 Q     -- you know, from others in the
16 courthouse or friends?

17 A     No.

18 Q     Okay.  So Sunny -- you had a conversation
19 on the phone with Sunny on December 21st, 2005, and
20 Sunny told you after you said that you were
21 interested in the job to report on January 2nd,
22 2006, correct?

23 A     Correct.

24 Q     Where did she tell you to report?

6  (Pages 18 to 21)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

22

1 A     Court Services.
2 Q     That's right.
3        And did you report on that day?
4 A     Yes.
5 Q     Prior to reporting on January 2nd, 2006,
6 did you speak with anyone else about the job of
7 tipstaff?
8 A     No.
9 Q     All right. Tell me what happened when
10 you showed up on the first day of work.
11 A     First day of work, I was told to go to
12 tipstaff's office.
13 Q     Where was that located at the time?
14 A     Down in the plaza level.
15 Q     Do you know where in the plaza level?
16 A     Yes. When you go down the long
17 staircase, it's in that area.
18 Q     The jurors' area?
19 A     Yes.
20 Q     Back where the court reporters' offices
21 are?
22 A     Yes.
23            MR. GONZALES: Off the record a
24         second.

23

1            (At this time, a discussion was
2         held off the record.)
3 BY MR. GONZALES:
4 Q     All right. So did you go to the tipstaff
5 office?
6 A     Yes.
7 Q     And what happened when you got there?
8 A     I had to sign in. There is a sign-in
9 sheet every day, and I was given an assignment.
10 Q     Who was in the office that told you, you
11 had to sign in and gave you your assignment?
12 A     My supervisor.
13 Q     And who was that?
14 A     Dolly Strizziere.
15 Q     Was this the first time you met Dolly?
16 A     No.
17 Q     And when was the first time you met Ms.
18 Strizziere?
19 A     Dolly I've known for many years because
20 she worked in the public defender's office.
21 Q     How was your relationship with Dolly
22 before you became a tipstaff?
23 A     Fine.
24 Q     Did she treat you appropriately and

24

1 cordially?
2 A     Yes.
3 Q     Did you treat her appropriately and
4 cordially?
5 A     I tried.
6 Q     Okay. Did you ever see Dolly -- before
7 you became a tipstaff now, did you ever see Dolly
8 treating anyone inappropriately?
9 A     No.
10 Q     Did you ever hear Dolly make any racially
11 derogatory comments before you became a tipstaff?
12 A     No.
13 Q     Did you ever see Dolly treat any
14 African-American employees inappropriately before
15 you became a tipstaff?
16 A     No.
17 Q     Now, when you applied for the tipstaff
18 position, was there any -- did you have any
19 understanding as to whether or not it was a
20 full-time job versus a part-time job?
21 A     Tipstaff position is part-time, one month
22 on and one month off.
23 Q     And you knew that at the --
24 A     And I knew that from the beginning.

25

1 Q     Okay. And that's from your experience
2 being in the courthouse for --
3 A     That's correct.
4 Q     I won't do the math.
5        Now, when you first started and you went
6 in and spoke with Dolly on that first day, did you
7 have -- did she have any discussions with you about
8 the job of tipstaff and what would be expected of
9 you?
10 A     No.
11 Q     When she gave you the assignment, what
12 did she tell you?
13 A     Well, first of all, we were given a
14 document which spelled out what all of the
15 requirements are for a tipstaff, and I was not sent
16 into a courtroom by myself. I was sent with
17 another tipstaff.
18 Q     Do you remember who that first --
19 A     I really don't.
20 Q     Okay. The document that you were given,
21 I didn't see that document in the materials that
22 you had produced. Do you still -- do you still
23 have a copy of it?
24 A     I can give you -- get a copy for you,

7 (Pages 22 to 25)

NAOMI C. SATTERWHITE

26

1 yes.
2 Q      Okay.  And I'll follow up with your
3 attorney about that.
4 A      Sure, um-hmm.
5 Q      When you got this document that explained
6 what the requirements of the job of tipstaff was,
7 did you get a chance to read it?
8 A      Not then, no.
9 Q      Not before you went to your first
10 assignment?
11 A      No.
12 Q      When you went to the tipstaff office,
13 were there other tipstaffs there?
14 A      Yes.  We called it the -- we call that
15 room going to the pool.
16 Q      The pool.  Okay.
17 A      Um-hmm.
18 Q      It's sort of like a rollcall room where
19 everybody comes and gets their assignments and
20 goes?
21 A      It's where you come in, you get your
22 assignment, because the assignment is done on a
23 sheet, and they just sit there.  They talk.  They
24 eat food, whatever.  It's like you're having a good

27

1 time with your coworkers before you get down to the
2 real business.
3 Q      You said that tipstaffs work one month
4 on, one month off?
5 A      Um-hmm.
6 Q      How about during the workday itself?  Do
7 they work a full day typically, or how does it
8 work?
9 A      At one time, we all worked a full day,
10 8:30 to 12, no pay for an hour lunch, one to 4:15.
11 Q      Okay.  You said "at one time."  Did that
12 change?
13 A      Yes.  As I understand, it has changed.
14 Q      Did it change while you were a tipstaff?
15 A      It was changing.
16 Q      What does that mean?
17 A      There were times when if a judge was
18 down, courtroom was down, and he had -- and it was
19 your courtroom, then you had to sit in the pool
20 that day meaning sit in a room where there's nobody
21 else and wait and hope that you get an assignment.
22      I was the kind of person that I felt that
23 if my courtroom is going to be down and I am not
24 needed and a supervisor had no other place for me

28

1 to go, it was a waste of the money for the county
2 for me to have to come in for a half day, and I
3 would, therefore, ask the supervisor for being off.
4      There were times that she didn't think
5 that I would be taking off, but if there's no work,
6 there was no reason for me to be wasting county
7 money.
8 Q      Right, and I saw that in some of the
9 materials.  There's some memos that discuss some
10 incidents.  I'm sure you're very familiar with
11 them.
12 A      Um-hmm.
13 Q      But you said that things changed, so to
14 me, that implied that it changed for all of the
15 tipstaffs?
16 A      That's correct.
17 Q      Okay.  So as a result of your speaking to
18 your supervisors about not wasting county money
19 sitting around in the pool room, did the policy,
20 the work schedule, change for the tipstaffs?
21 A      No, no.
22 Q      Okay.
23 A      The change, as I understand, came from
24 upstairs.

29

1 Q      Upstairs meaning court administration or
2 PJ?
3 A      Court Services.  I don't specifically
4 know where the change came from, but I did hear
5 that you -- if you're not assigned, you don't come
6 in now.
7 Q      Okay.  Do you know when that policy went
8 into effect?
9 A      No, I don't, really.
10 Q      Okay.  All right.  So on that first day,
11 you get your sheet of paper that tells you what the
12 requirements are, and you're sent to your
13 assignment with the more experienced tipstaff,
14 correct?
15 A      Correct.
16 Q      Was it understood or was it ever
17 explained to you that the reason you were going
18 with another tipstaff was so that that other
19 tipstaff could help sort of teach you the ropes of
20 what was expected of you?
21 A      Yes, yes.
22 Q      You hesitated.
23 A      I hesitated because when I first heard
24 what -- the reason for the tipstaff, I thought,

8  (Pages 26 to 29)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

30

1 God, I've been around here all these years. I
2 pretty much know what to do, but this is the
3 assignment I have, and so I will go, no problem.
4 Q     Well, did you tell Dolly that, that
5 you --
6 A     No, no.
7 Q     Wait until I finish asking the question.
8          MS. JAMISON: You've got to let
9 him finish.
10 BY MR. GONZALES:
11 Q     Did you ever tell Dolly that because of
12 the years of experience you had as a secretary, you
13 didn't need assistance from another tipstaff?
14 A     Of course not. I would never do that. I
15 was there to follow the rules.
16 Q     Did you ever tell anyone that you felt
17 that because of your years of experience in the
18 courthouse, that you didn't need to have another
19 tipstaff telling you what to do?
20 A     No, I did not.
21 Q     Would you have another tipstaff assigned
22 to you every day, or were there some days where you
23 were on your own?
24        You know what? Let me clarify that for

31

1 you. I'm sorry. Because it's my understanding
2 that this was only at the beginning during your
3 probationary period is when you would have somebody
4 with you; is that right?
5 A     That's correct.
6 Q     And then after you completed your
7 probationary period, you were on your own
8 basically?
9 A     Correct.
10 Q     Okay. So this question is basically
11 during the probationary period. Was there ever an
12 occasion where you did not have another tipstaff in
13 the courtroom with you?
14 A     No.
15 Q     Did you always have the same tipstaff
16 assigned to work with you?
17 A     If the assignment was for a week and it
18 was the same courtroom, then yes.
19 Q     But if you changed from week to week --
20 for example, if in the first week you were in Judge
21 Albright's chambers, but in the second week, you
22 were in Judge Moore's chambers, it's possible that
23 you would have had different tipstaffs working with
24 you; is that correct?

32

1 A     Not in the chambers.
2 Q     When I say "chambers," that's a misnomer.
3 I mean in the courtroom. If you were working, for
4 example, in Judge Albright's courtroom the first
5 week of January, but then the second week of
6 January you're in Judge Moore's courtroom, you
7 would have different tipstaffs working with you; is
8 that correct?
9 A     Correct.
10 Q     All right. It wasn't like there was one
11 tipstaff who was taking you under their wing and
12 would follow you from assignment to assignment,
13 correct?
14 A     Correct.
15 Q     Now, during that 90-day probationary
16 period, were you ever asked to answer phones in the
17 chambers of a particular judge?
18 A     Yes.
19 Q     Oh, you were. Okay. And how often did
20 that happen?
21 A     Well, I know my first assignment was
22 January the 31st, and that was with Judge Moore.
23 Q     Okay. And how -- how long did you answer
24 phones for Judge Moore during that assignment?

33

1 A     For that day.
2 Q     And about how often were you assigned to
3 answer the phones as a tipstaff in chambers?
4 A     Whenever there was a need.
5 Q     Can you give me an estimate about how
6 many times that may have been?
7          MS. JAMISON: During the
8          probationary period?
9          MR. GONZALES: During the
10         probationary period.
11         THE WITNESS: And the
12         probationary period was a three-month
13         period, and I only worked -- no, I worked
14         each month during that three-month
15         period. I am not completely sure.
16 BY MR. GONZALES:
17 Q     Well, I don't want you to guess, and your
18 attorney I'm sure --
19 A     I'm not going to guess.
20 Q     Let me ask you this: Did you keep
21 records? Because I know you kept a very careful
22 log or calendar of things.
23 A     Yes.
24 Q     Did you record when you would be

9 (Pages 30 to 33)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

34

1 answering phones as opposed to just a tipstaff in a
2 courtroom?
3 A    Yes.
4 Q    Okay. So if I were to look at your
5 calendar that you had already produced, I should be
6 able to see when you answer the phones, and if it's
7 not on that calendar, then you didn't answer the
8 phones?
9 A    That's correct.
10 Q    Okay. Now, you had said something in
11 your previous answer that I want to clarify.
12 Typically a tipstaff works one month on, one month
13 off, but during your probationary period, you
14 worked the three months in a row, correct?
15 A    Correct.
16 Q    So for two of those months, your
17 supervisor was Dolly Strizziere, correct?
18 A    Yes.
19 Q    And then one of those months -- I guess
20 it would be February -- your supervisor would have
21 been Peggy Berger, correct?
22 A    Correct.
23 Q    Because they're the two supervisors of
24 the tipstaffs, right?

35

1 A    Correct.
2 Q    Dolly has -- don't they break them into,
3 like, A and B?
4 A    Correct.
5 Q    And which one were you on?
6 A    I was on the B Team.
7 Q    That's it, team. So B Team is Dolly, and
8 A Team is Peggy?
9 A    Um-hmm.
10 Q    You have to say yes or no.
11 A    Yes.
12 Q    Now, let's talk about Peggy Berger a
13 little bit.
14 A    Yes.
15 Q    How long had you known Peggy Berger
16 before January of 2006?
17 A    For as long as I worked at the courthouse
18 and she worked at the courthouse. She worked in
19 the prothonotary's office.
20 Q    Okay. And did you get along with Peggy?
21 A    Very well.
22 Q    I'll ask you the same questions I asked
23 about Carol and Dolly. Had you ever seen Peggy
24 treat anyone inappropriately?

36

1 A    No.
2 Q    Did you ever hear Peggy use any racially
3 derogatory language?
4 A    No.
5 Q    Did you ever see Peggy treat any
6 African-American individuals inappropriately or in
7 a discriminatory manner?
8 A    No.
9 Q    So how did things go in January?
10       MS. JAMISON: Objection to the
11    form. What do you mean, how did things
12    go? Vague question.
13       MR. GONZALES: It is a vague
14    question, but it's purposely supposed to
15    be vague.
16 BY MR. GONZALES:
17 Q    How did work go in January? How was your
18 interaction with the other tipstaffs, with the
19 court staffs? I mean, you were getting back in the
20 courthouse for the first time in several years.
21 How did it go for you?
22 A    Many of the tipstaffs I knew because they
23 had been of service to me.
24 Q    Um-hmm.

37

1 A    When Judge Davenport was a judge, not a
2 senior judge, because when he became a senior
3 judge, we only have two -- three tipstaffs that
4 worked for us. Other than that -- okay. I'm
5 trying to think about the month where there was a
6 problem. There was a joke, a racial sexual joke.
7 Q    And, again, maybe to help you out, my
8 understanding is, looking at the materials that you
9 already provided, that that was in February.
10 A    Okay.
11 Q    I think February 20th of 2006, because
12 Peggy was the supervisor, and so that's why I asked
13 you that question, because when I looked through
14 your materials, the first incident or, you know,
15 thing that I saw in your paperwork was an incident
16 in February of 2006, so that's why I asked you
17 about January.
18 A    Okay.
19 Q    I didn't see anything in your materials
20 that stuck out about what happened in January.
21 A    No.
22 Q    Anybody treat you inappropriately in
23 January?
24 A    No.

10  (Pages 34 to 37)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

38

1 Q       Okay.  Anybody use any racial slurs with
2 you in January of 2006?
3 A       No.
4 Q       Anybody circulate racial or ethnic
5 inappropriate -- well, strike that.
6         Did anybody circulate any type of ethnic
7 joke in January of 2006 --
8 A       No.
9 Q       -- whether it's about Italians or
10 African-Americans or Polish or anything like that?
11 A      No.
12 Q      Did you complain to anyone in the
13 courthouse about being treated inappropriately in
14 January of 2006?
15 A      No.
16 Q      All right.  Now let's move into February
17 of 2006.  Now we're switching.  You're going from
18 the B Team of Dolly.  Now you're working with
19 Peggy's A Team, correct, in February of 2006?
20 A      That's correct.
21 Q      All right.  So now we have a whole new
22 group of tipstaffs?
23 A      That's right.
24 Q      Okay.  All right.  So again I looked

39

1 through the records, and the first incident that I
2 could see was this racial joke that was circulated
3 in later February of 2006, so my question is,
4 before that, before that racial joke, how were you
5 treated by the other tipstaffs?
6 A       No problem.
7 Q       And did you feel that you were getting
8 the hang of being a tipstaff?
9 A       It was no problem.
10 Q      Did anyone treat you in an inappropriate
11 manner either by using racially derogatory language
12 towards you or saying things about you to others
13 during February of 2006 before the racial joke?
14 A      Not to my knowledge.
15 Q      Okay.  Now, let's talk about what
16 happened on the day that you discovered this racial
17 joke.  You came to work at the normal time?
18 A      Correct.
19 Q      All right.  When was the -- at what time
20 of the day did this -- did you find out about this
21 joke?
22 A      It was about 8:15 a.m.
23 Q      So was this before you went to your
24 assigned courtroom?

40

1 A       That's correct.
2 Q       And where were you?
3 A       I was walking into the tipstaff office.
4 Q       Were you walking into the tipstaff office
5 with anyone else?
6 A       By myself.
7 Q       Was anyone in the tipstaff office when
8 you got there?
9 A       It was full of people.
10 Q      All right.  Tell me what happened.
11 A      Okay.  I walked in, and I saw three black
12 women sitting one, two, three, and they were not in
13 their normal mood, and I looked at them, and I
14 said, "What's going on?"
15        And each looked at the other, and then
16 finally one said, "There was a joke told in here."
17        I said, "What kind of joke?"
18        They said, "A racial sexual joke."
19        I said, "Well, where is it?  Let me see
20 it.
21        "We don't have it."
22        I said, "Well, then somebody get it."
23        So Pat Waldrop asked the person who had,
24 in fact, read the joke, and her name was -- I call

41

1 her -- I call her the Barbie Doll because she --
2 Q       Why do you call her the Barbie Doll?
3 A       Jean Milos.
4 Q       You know I'm going to ask you that.  Why
5 do you call her the Barbie Doll?
6 A       Because her hair -- her hair is like a
7 Barbie Doll, and she's tall and thin, and her name
8 is Jean Milos.
9         So Jean Milos had the joke.  Pat Waldrop
10 asked her for it, and she gave it to her.  Pat went
11 over to the Xerox machine, photocopied it, and
12 brought it back to her seat.
13        The three women told me that it was read
14 out loud, and everybody thought it was funny, so it
15 was by that time, time to go on our assignments.
16 Q      All right.  Let me stop you there.  Did
17 Pat Waldrop think it was funny?
18 A      No.
19        MS. JAMISON:  Objection to the
20        form; calls for speculation.
21        MR. GONZALES:  It does.
22 BY MR. GONZALES:
23 Q      Did Pat Waldrop tell you that she thought
24 it was funny?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

NAOMI C. SATTERWHITE

42

1 A      She told me that she did not like it.
2 Q      Okay. And I think one of the other women
3 was Pearlie May?
4 A      That's right.
5 Q      Did she tell you what she thought about
6 the joke?
7 A      She did not like it.
8 Q      And she told you that?
9 A      Yes.
10 Q      Okay. Do you know who the third woman
11 was?
12 A      Yes, Margie Scott.
13 Q      And did she tell you what she thought
14 about the joke?
15 A      She did not like it.
16 Q      All right. Okay. So Pat gave you the
17 photocopy --
18 A      Yes.
19 Q      -- of the joke?
20 A      Yes.
21 Q      And what did you do at that point?
22 A      I immediately took it up to Carol's
23 office in Court Services, gave it to Sunny, and
24 when I walked in, Sunny could see across my face

43

1 something was bothering me, and she said, "What's
2 wrong?"
3         I handed her the joke, and I said, "This
4 should not be in the workplace." Sunny agreed and
5 told me that they would take care of it.
6 Q      Did you and Sunny say anything else to
7 each other at that time?
8 A      Sunny asked me where did it come from.
9 Q      What did you tell her?
10 A      I told her I was told it was from Jean
11 Milos, M-I-L-O-S.
12 Q      Anything else?
13 A      With that, I left and went on to my
14 assignment.
15 Q      All right. Was there any follow-up with
16 you about that joke from anyone?
17 A      I later saw Sunny, and she said they had
18 taken care of it. Then I heard through the
19 grapevine that it had a telescoping effect, that
20 that joke had come from a court -- court clerk.
21 Q      Do you know who that court clerk was?
22 A      No.
23 Q      Okay. Before we get into the grapevine
24 part of it, I want to concentrate on the official

44

1 communication, so to speak, you know, actual
2 communications you had with people in Court
3 Services or your supervisor about this joke.
4         You said Sunny later told you that it had
5 been taken care of?
6 A      Um-hmm.
7 Q      That's a yes?
8 A      Yes.
9 Q      Okay. Where was she when she told you
10 that? Do you know?
11 A      It was in a hallway, but I don't remember
12 now what hallway.
13 Q      Did she give you any details or tell you
14 anything more specific than it had been taken care
15 of?
16 A      No.
17 Q      Did you ask her how it had been taken
18 care of?
19 A      No.
20 Q      Did you tell Sunny that you felt that
21 that was inappropriate or that you were not
22 satisfied with it being taken care of?
23 A      No.
24 Q      After Sunny, did you speak with Carol

45

1 about that joke?
2 A      No.
3 Q      Did you speak with -- it would have been
4 Peggy Berger who was the supervisor of Team A. Did
5 you speak with Peggy Berger about the joke?
6 A      No.
7 Q      After that day, did any tipstaffs
8 circulate racial jokes?
9         MS. JAMISON: Objection to the
10         form.
11         MR. GONZALES: That you were
12         aware of.
13         MS. JAMISON: Thank you.
14         THE WITNESS: No.
15 BY MR. GONZALES:
16 Q      All right. Now let's talk about the
17 grapevine.
18 A      Okay.
19 Q      Which I'm shocked to hear there's a
20 grapevine in the courthouse.
21 A      Oh, please.
22 Q      All right. What happened? What did you
23 hear, and when did you start hearing it?
24 A      Shortly thereafter, Pearlie May told me

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

46

1 that several of the men heard the joke, came and
2 apologized to her about it.  They felt very badly.
3 Q      When you say "men," did you --
4 A      Men tipstaffs.
5 Q      And that's what you understood her to be
6 referring to?
7 A      Yes.
8 Q      Okay.  What else did you hear?
9 A      That's pretty much it.
10 Q      Did you ever have any conversations with
11 Jean Milos about the joke?
12 A      Of course not, no.
13 Q      Okay.  Did she ever have any
14 conversations with you about the joke?
15 A      No.
16 Q      Do you know whether Pearlie May or Pat
17 Waldrop or Margie Scott ever spoke to Jean Milos
18 about the joke?
19 A      No, I do not know.
20 Q      Were you aware of any other discussion
21 about the joke after hearing what happened through
22 the grapevine and speaking to Sunny?
23 A      No.
24 Q      Now, since that time -- I asked about I

47

1 guess racial jokes -- have you heard about any
2 ethnic jokes being circulated or spoken about among
3 the tipstaffs?
4 A      No.
5 Q      No jokes about Italians or Polish?
6 A      No.
7 Q      Were there any other incidents that you
8 can recall that occurred in February of 2006 that
9 were out of the ordinary or that you felt were
10 inappropriate in any way?
11 A      No.
12 Q      Okay.  All right.  So you finished your
13 sort of tour of duty with Peggy's Team A, A Team,
14 and now we're back to -- now we're in March of
15 2006, and you're back with Dolly's B Team, correct?
16 A      Correct.
17 Q      All right.  Anything happen in March?
18 A      Yes.
19 Q      What happened?
20 A      Norma Prinzo -- after arriving as a
21 tipstaff, many of the tipstaffs had told me that
22 Norma Prinzo was a problem, that many of them just
23 had to bite their tongue because she was Dolly's
24 dear friend and that she did not know how to treat

48

1 coworkers.
2 Q      When did you hear that?
3 A      Right from the beginning.
4 Q      Okay.  And were these just she was a
5 problem toward other African-American tipstaffs or
6 just --
7 A      No, all people.
8             MS. JAMISON:  Wait until he
9      finishes.  Slow down.
10             MR. GONZALES:  That's okay.
11      Everybody does it.
12 BY MR. GONZALES:
13 Q      When you heard this about Norma, were
14 people talking about how she was a problem just
15 toward African-American tipstaffs, or was she just
16 sort of a problem to everybody?
17 A      A problem to everybody.
18 Q      Okay.  All right.  So Norma Prinzo.
19 A      All right.  So I was assigned to Judge
20 Furber's courtroom with Norma Prinzo.
21 Q      Was this the first time you were assigned
22 to a courtroom with Ms. Prinzo?
23 A      Yes.  I don't remember the date, but it
24 was in March.

49

1 Q      I got it because you wrote it down.
2 That's why I have it.
3 A      Good.
4 Q      I have it as March 21st.  Does that sound
5 right?
6 A      That sounds about right.
7 Q      So let's do it this way:  So March 21st,
8 2006, you are assigned to Judge Furber's courtroom
9 along with Norma Prinzo, correct?
10 A      Correct.
11 Q      You're still in your probationary period
12 at this time, correct?
13 A      Correct.
14 Q      What time were you supposed to go there
15 to his courtroom?  Do you remember?
16 A      Be there by 8:30.
17 Q      Typical starting time?
18 A      Yes.
19 Q      All right.  When you got to -- well, when
20 was the first time you saw Norma that day?
21 A      In the courtroom.
22 Q      So you had no discussions with her down
23 in the pool area?
24 A      No.

13 (Pages 46 to 49)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

NAOMI C. SATTERWHITE

**50**

1 Q      All right.  Did you have a normal routine
2 of what you would do when you would first get to a
3 courtroom, or did it change based on the judge and
4 what was happening?
5 A      Well, my policy was that whenever I was
6 assigned to a courtroom, I always went to the
7 tipstaff, the seasoned tipstaff, first to find out
8 what he or she wanted me to do.  I didn't want to
9 overstep their -- my bounds.  Okay?
10      And I asked Norma did she want the
11 pitchers filled.  She grunted at me.  So I went on
12 and did the pitchers.  I asked her about the
13 glasses.  I got another grunt.
14 Q      You mean whether the glasses needed to be
15 cleaned or anything?
16 A      No.  The glasses -- it is a policy the
17 glasses must be cleaned the night before at the end
18 of each day.  Okay?  So you start with clean
19 glasses every morning.
20      Well, after that, I went and took a seat,
21 and she took a seat and began to talk with Trish
22 Kaplan who was -- who is a court clerk.  The court
23 clerk who was assigned to Judge Furber was Liz
24 Orio.  Okay?

**51**

1      So I sat in the chair on the floor just
2 before you go into the judge's chambers.  Norma sat
3 up in the -- in the seats where the jurors sit,
4 and --
5 Q      I'm sorry.  Do you remember what
6 courtroom?  Was this Judge Furber's typical
7 courtroom in the front of the --
8 A      Yes, on the side there, yeah.
9 Q      Okay.
10 A      And so the rest of the morning, Judge
11 Furber was in and out of chambers.  Norma totally
12 ignored me and sat with her back to me talking to
13 Trish.  I heard the whole conversation, but it
14 didn't bother me.
15 Q      Was she talking about you?
16 A      No.
17 Q      Okay.
18 A      She was not.  Then it was near lunchtime.
19 Norma comes down out of the jury box, walks to the
20 table, and looks back at me and points her finger
21 and says, "I'm taking these files downstairs.  You
22 will take that file across the street."  I looked
23 at her and smiled.
24      So I go on to lunch.  When I returned

**52**

1 from lunch, I waited and then I asked Liz Orio, the
2 court clerk, if she had any other files to give to
3 Domestic Relations or whether she was expecting
4 the return of any files from Domestic Relations,
5 and she told me no, and I told her, "Well, I'm
6 leaving now," and that was after one o'clock.
7      So I went over, dropped the file off at
8 Domestic Relations, and went up to the fourth floor
9 to the senior suites, saw Judge Davenport and Jane
10 Goldey, and I took my time and talked to them.
11      The reason I did that, I felt since I was
12 a ghost that morning for Norma, I may as well
13 become a real ghost and disappear, so I stayed gone
14 for about an hour, and I came back, and when she
15 came in from wherever she was, she got in my face
16 and she says, "Where were you?" I smiled.  I
17 didn't answer her, and shortly thereafter, she
18 left, so I finished up in the courtroom.
19      The next morning, I came in.  I said to
20 my supervisor, "Dolly" — I said, "Dolly, I want
21 you to give me another assignment because I will
22 not go back into the courtroom and be treated today
23 the way I was treated yesterday.
24      "Oh, you just have to ignore."

**53**

1      I said, "No, no.  I've never been treated
2 this way in all the years that I have worked."
3      So she did give me another assignment,
4 and I thought about this, and it took me a couple
5 days, and I thought, you know what?  This is not
6 good.  Everybody's been telling me that she treats
7 people badly.  I've never done anything to this
8 woman, and for her to have treated me like I was a
9 nothing in a courtroom, I don't have to tolerate
10 this.
11      So I wrote her a letter with a copy to
12 Dolly, and when I gave it to her that morning, I
13 gave a copy -- I gave Dolly a copy of the letter, I
14 gave Norma the original of the letter, and I took a
15 copy up to Carol's office; and when I gave Dolly
16 the copy, she says, "Oh, you just have to learn to
17 ignore things." I just turned around and walked
18 away.
19      I saw Carol several days later, and I
20 asked her had she spoken to Norma.  She said yes,
21 that Norma told her, "Well, she's not a warm and
22 fuzzy kind of person."
23      I told Carol, "Well, I don't come to work
24 to be warm and fuzzy.  I come to do a job and to

**14 (Pages 50 to 53)**