IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAOMI C. SATTERWHITE | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-1024 |
| MONTGOMERY COUNTY ET AL. | : | |

**SURRICK, J.**                                              **SEPTEMBER  14 , 2011**

### MEMORANDUM

Plaintiff Naomi Satterwhite filed this lawsuit against Defendants Montgomery County

and Montgomery County Court of Common Pleas alleging race discrimination in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C.

§ 1981.  Presently before the Court is Defendant Montgomery County's Motion for Summary

Judgment.  (ECF. No. 31.)  For the following reasons, the Motion will be granted.

## I.      BACKGROUND

Naomi Satterwhite is African-American.  (Compl. ¶ 14, ECF No. 1.)  She is currently

employed by Montgomery County as a part-time on-call judicial secretary.[1]  (Satterwhite Dep.

9:10-18, ECF Nos. 36-3, 36-4, 36-5.)  Her current position is part-time with no set schedule, and

she comes to work on an as-needed basis when she receives a call from the court requesting her

---

[1] There is confusion in the record as to the titles of the positions held and applied for by
Plaintiff.  Plaintiff referred to the part-time on-call judicial secretary as the "floating on-call
secretary," the "judicial secretary substitute," the "substitute secretary," the "floater," and the
"floating secretary" at different points during her deposition.  Montgomery County interprets
"floater" to refer to substitute judicial secretary position.  For purposes of clarity, we will refer to
the two positions at issue in this case as simply "part-time on-call judicial secretary" or
"substitute judicial secretary."
    Plaintiff refers to her current position as "floating on-call secretary" in her Complaint,
which is the same as the part-time on-call secretary position.  (Compl. ¶ 14.)

services.  (*Id.* at 9:18-24.)

Plaintiff began working for Montgomery County in 1976 as a full-time judicial secretary for the Honorable Horace A. Davenport, a highly respected Judge of African-American descent. (*Id.* at 11:1-4.)  She continued in that position until 2000, when she retired from full-time employment.  (*Id*. at 11:12-15.)  In 2002, Plaintiff briefly returned to work for Montgomery County as a part-time judicial secretary for both Judge Davenport and the Honorable William W. Vogel, until the retirement of Judge Davenport in December of 2002.  (*Id*. at 11:12-23.)

In November 2005, Plaintiff submitted an application for the position of "tipsta[ff] or floating judicial secretary."[2]  (*Id*. at 15:13-17.)  There was no judicial secretary position available at that time, but Carol Dillon, the Deputy Court Administrator for Court Services, discussed Plaintiff's application for both positions with Court Administrator Michael Kehs and President Judge S. Gerald Corso.  (Dillon Dep. 58:3-60:7, ECF Nos. 36-6, 36-7.)  They all agreed that Plaintiff would be best suited for the tipstaff position.[3]  (*Id.* at 61:1-9.)

Shortly after Plaintiff submitted her application, Judge Davenport called Judge Corso and requested that Plaintiff be moved to the top of the waiting list for a tipstaff position.  (Satterwhite Dep. 15:24-16:24.)  On January 2, 2006, Plaintiff was hired as a tipstaff and reported to Tipstaff

---

[2] The record is not clear as to whether Plaintiff intended to apply for a substitute judicial secretary position or a part-time on-call secretary position in November 2005.

[3] The record includes extensive facts regarding Plaintiff's qualifications for the tipstaff position as well as the secretary positions.  Dillon, Kehs and Judge Corso all testified in their depositions about Plaintiff's behavior and performance as an employee.  There were several problems with Plaintiff during her probationary period as a tipstaff.  Moreover, there was a list of judges who requested that Plaintiff not be assigned to their courtrooms.  For the reasons hereinafter discussed, we need not address such matters to decide the issues raised in the instant Motion.

Supervisor Dolly Strizziere to complete her mandatory sixty-day probationary period.  (*Id.* at 21:18-22:12, 23:10-14.)

At the conclusion of the probationary period, in September of 2006, Plaintiff assisted with secretarial work in Judge Barrett's chambers and became interested in returning to a secretary position.  (Satterwhite Dep. 79:7-9.)  As a result, Plaintiff contacted Dillon and told her that she was interested in a "floating secretary position."  (*Id.* at 79:11-17.)  Plaintiff testified that she was referring to a part-time on-call secretary position.  (*Id.* at 80:17-20.)

In October 2006, a vacancy for "Judicial Secretary (Part-time)" became available.  (Dillon Dep. 46:13-17.)[4]  The position was posted on the Montgomery County website and Dillon received multiple applications for the position.  (*Id.* at 46:21-24.)  Dillon narrowed the pool of applicants down to eight, including Plaintiff, and conducted interviews.  (*Id.* at 76:4-7.)  Plaintiff was the only African-American candidate to apply.  (*Id.*)

On November 1, 2006, Dillon called Plaintiff to her office to discuss Plaintiff's interest in the available position.  (Satterwhite Dep. 79:21-80:24.)  Immediately after their meeting, Plaintiff wrote a letter to Dillon confirming their conversation.  (*Id.* at 82:13-17.)  Plaintiff's letter states that she informed Dillon that she was interested in a "full-time floater," which was the substitute judicial secretary position, as opposed to a part-time on-call position that Dillon stated was available.  (Def.'s Mot. Ex. K.)  At her deposition Plaintiff clarified that she was not interested in a substitute judicial secretary position, and only put that in the letter to "see what was going to

---

[4] Dillon refers to the October 2006 vacancy as "part-time" in her deposition.  However, in her November 3, 2006 letter to Judge Corso, Dillon refers to the position as "on a full-time basis."  (Pl.'s Resp. Ex. 11, ECF Nos. 36-16.)  It is unclear from the record whether Defendants were looking for a part-time on-call secretary or a substitute judicial secretary in October 2006.

happen." (Satterwhite Dep. 92:11-12.)  Plaintiff testified that when she arrived at the meeting

with Dillon on November 1, 2006, she said, "[b]ut Carol, I'm not interested in a full-time job.

I'm only interested in an on-call part-time job." (*Id.* at 82:1-6.)  Plaintiff did not want a

substitute judicial secretary position because that was a full-time position and she understood that

if she went back to working full time for Montgomery County, her pension would be put on hold.

(*Id.* at 90:6-91:6.)

Plaintiff did express interest in a part-time on-call secretary position "provided [she] was

given an approximate schedule for services needed rather than waiting for a call." (Def.'s Mot.

Ex. K.)  At her deposition Plaintiff clarified her position indicating that getting a call at five after

eight in the morning just did not work for her schedule back in November of 2006.  (Satterwhite

Dep. 89:15-20.)  Dillon advised Plaintiff that the part-time on-call position did not include a set

schedule.  (Dillon Dep. 66:1-67:9 ("[T]he nature of the position is that you would get a call

between 8:15, even 8:30 and you would have to get here as soon as you could.").)  The official

description for the part-time on-call position states that the selected applicant "will serve as a

substitute secretary to Common Pleas Court Judges, to be utilized **on an as needed basis.**"

(Def.'s Mot. Ex. L.)

After conducting interviews, Dillon submitted a memorandum to Judge Corso indicating

her top three choices for the position.  (*Id.* Ex. J.)  For the remaining applicants, Dillon gave

reasons why they might not be best suited for the position.  (*Id.*)  With respect to Plaintiff, Dillon

stated that, "Naomi also expressed her desire to be considered for one of the full-time

positions–however, in her letter she states: 'I would consider [the part-time on-call position]

provided I am given an approximate schedule for services needed rather than waiting for a call.'"

4

(*Id.*)

On November 16, 2006, Dillon sent a letter notifying Plaintiff that she had not been selected for the "judicial secretary position," but that they would keep her resume on file.  (*Id.* Ex. N; Satterwhite Dep. 101:2-13.)  Plaintiff believed this letter only addressed her application for the substitute judicial secretary position and did not address the part-time on-call position. (Satterwhite Dep. 101:14-24.)  However, the women who were selected for the available positions were hired on a part-time on-call basis.  (Dillon Dep. 83:4-8.)  Plaintiff was not hired for the position because she needed a "set schedule," which was something the on-call job, by its nature, could not accommodate.  (*Id.* at 66:19-67:1.)

Plaintiff discovered in March or April of 2007, that two part-time on-call secretaries, both white females, had been hired.  (Satterwhite Dep. 102:20-24.)  Plaintiff did not speak with Dillon or Kehs about the part-time on-call secretary positions until October 31, 2007, when she wrote a letter to Dillon expressing her disappointment and surprise that she had not been considered or hired for the position.  (Def.'s Mot. Ex. O.)  Plaintiff explained in her deposition that she waited nearly six months to follow up on the position because "I wanted to see just what was going to happen, and especially after I had already heard that they had hired two white women for the position, I just wanted to see whether they were going to ever consider me."  (Satterwhite Dep. 106:1-5.)

Kehs responded to Plaintiff's October 31, 2007 correspondence with a letter on November 1, 2007, in which Kehs informed Plaintiff that she had been considered for the position in 2006 by Judge Corso, but had not been hired.  (*Id.* at 130:9-131:4; Def.'s Mot. Ex. P.) In response, Plaintiff sent another letter on November 13, 2007.  (Satterwhite Dep. 133:18-20;

Def.'s Mot. Ex. Q.)  In this letter, Plaintiff told Kehs that she "ha[s] at all times been interested in a floater position and [is] notifying you now that when another floater position becomes available [she is] interested."  (Def.'s Mot. Ex. Q.)  At her deposition Plaintiff clarified that when she said "floater position" she was referring to a part-time on-call position.  (Satterwhite Dep. 137:15-17.)

On January 9, 2008, attorney Mark Turetsky contacted Kehs on Plaintiff's behalf to inform him that Plaintiff was interested in a "substitute secretary position" that would soon become available.  (Pl.'s Resp. Ex. 19 at ¶ 5.)  Turetsky did not specify whether he was referring to a part-time on-call position or a substitute judicial secretary position.  (*Id.*)  Turetsky also indicated that Plaintiff felt she had previously been denied the position based on her race.  (*Id.*)  Kehs responded that he did not make hiring decisions based on race, and encouraged Plaintiff to apply for any positions for which she was qualified.  (*Id.*)

In March of 2008, a part-time on-call secretary position became available and was posted on the Montgomery County website.  (Satterwhite Dep. 126:1-2.)  Plaintiff applied for the position on March 26, 2008.  (*Id.* at 126:1-18.)  Dillon conducted an interview of Plaintiff during which Plaintiff indicated that she now understood the nature of the on-call position and would not in any way be limited in terms of needing a set schedule.  (*Id.* at 129:2-12.)  Plaintiff was hired and began work as a part-time, on-call secretary on April 21, 2008.  (*Id.* at 127:21-128:1.)

After Plaintiff had been hired, Dillon contacted her to inform her of a substitute judicial secretary position that had become available.  (*Id.* at 143:7-11.)  Plaintiff responded with a letter on April 13, 2008, indicating that she was not interested in the substitute judicial secretary position because it was full-time, and she did not want to disturb her pension.  (*Id.* at 143:18-144:6.)

6

## II.     LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003).  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) (stating that an opposing party must support its assertion by "citing to particular parts of materials in the record"); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party may not avert summary judgment by relying on speculation or by rehashing the allegations in the pleadings.  *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Moreover, courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54

7

F.3d 1125, 1127 (3d Cir. 1995).

## III.   DISCUSSION

Title VII provides that "[i]t shall be unlawful employment practice for an employer–(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts."  42 U.S.C. § 1981(a).  "The term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.* § 1981(b).[5]  Montgomery County argues that Plaintiff has failed to offer sufficient evidence to support her claims under either Title VII or § 1981.  (Def.'s Mot. ¶ 10.)  Plaintiff contends that there is sufficient evidence in the record to raise a triable issue of fact.  (Pl.'s Resp. 1.)

A plaintiff can establish discriminatory intent on the part of her employer by direct or indirect means.  *Hankins v. City of Philadelphia*, 189 F.3d 353, 363 (3d Cir. 1999) (citations omitted).  If the plaintiff's evidence is entirely of an indirect nature, as is typically the case, then she must satisfy the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Hankins*, 189 F.3d at 363.  Here, Plaintiff

---

[5] Courts in this circuit apply the same analysis to both Title VII claims and § 1981 claims of racial discrimination since "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010) (quoting *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009)).

concedes that she has no direct evidence of discrimination.  (Pl.'s Resp. 16 ("Like most plaintiffs who come before the federal courts with discrimination claims, Plaintiff has no direct evidence of discrimination.").)  Therefore, this case is properly analyzed under the *McDonnell Douglas* burden-shifting framework.

Under this framework, the plaintiff must be able to establish a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff succeeds in establishing a prima facie case, the defendant must then produce a legitimate, nondiscriminatory explanation for the purportedly discriminatory conduct.  *Id.*  If the defendant meets this burden of production, the plaintiff must show by a preponderance of the evidence that the defendants' proffered legitimate reason is merely a pretext for discriminatory conduct.  *Id.* at 804.  Although this framework is well established, it is not "intended to be rigid, mechanized, or ritualistic." *Weldon v. Kraft*, 896 F.2d 793, 798 (3d Cir. 1990) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

## A.   Plaintiff's Prima Facie Case

To establish a prima facie case of discrimination in Title VII failure to hire cases, a plaintiff must show (1) that she belongs to a protected class, (2) that she applied for and was qualified for a position for which the employer was seeking applicants, (3) that despite those qualifications, she was rejected, and (4) that after being rejected, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.  *See Fuentes v. Perksie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *McDonnell Douglas*, 411 U.S. at 802).  If a plaintiff is able to establish a prima facie case, an inference of discrimination is established.  *Waris v. HCR Manor Care*, No. 07-3344, 2009 WL 330990, at *10 (E.D. Pa. Feb.

9

10, 2009) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (noting that the purpose of the *prima facie* case is to raise an "inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors")).  The *prima facie* case plays an important role in the litigation.  It eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *Teamsters v. United States*, 431 U.S. 324, 358 & n.44 (1977)).  "[T]he prima facie case under the *McDonnell Douglas-Burdine* pretext is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (citing *Burdine*, 450 U.S. at 253).

Montgomery County contests the second element of Plaintiff's prima facie case, arguing that Plaintiff was not qualified for the positions in question.  (Def.'s Mot. 18-19, 21-22.)  As mentioned above, there is confusion in the record as to the names of the positions in question in this case.  Plaintiff and Montgomery County are both inconsistent in how they refer to the positions for which Plaintiff applied.  Despite the confusion, it is clear that the two positions at issue here are:  (1) the part-time, on-call secretary position; and (2) the substitute judicial secretary position.

With regard to the part-time, on-call secretary position, Montgomery County argues that Plaintiff was not qualified at the time she applied in October-November, 2006, because she was not willing to work on an on-call basis without advance notice of her schedule, which was required for this position.  (Def.'s Mot. 19.)  Montgomery County asserts that Plaintiff's requirement of a set schedule was the motivating reason behind the decision not to hire Plaintiff, as is evident from Montgomery County's decision to hire Plaintiff for the part-time, on-call

10

position as soon as she indicated in 2008 that she did not require a set schedule.  (*Id*.)

The Third Circuit has held that "objective job qualifications should be considered in evaluating a plaintiff's prima facie case."  *Goosby v. Johnson & Johnson*, 228 F.3d 313, 320 (3d Cir. 2000) (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793 (3d Cir. 1990)).  Subjective qualities, such as leadership and management skills, are better left to later stages of the *McDonnell Douglas* framework.  *Weldon*, 896 F.2d at 798.  However, when there is unchallenged objective evidence that Plaintiff lacks the minimal qualifications for a position, a prima facie case of discrimination cannot be made out.  *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008) (holding that a "plaintiff has failed to establish a prima facie case of a Title VII employment discrimination claim if there is unchallenged objective evidence that s/he did not possess the minimal qualifications for the position plaintiff sought to obtain or retain")[6]  Performance-related qualities such as productivity, compliance with workplace safety regulations, leadership abilities, and management skills are subjective qualifications.  *See Donlin v. Philips Elecs. N. Am. Corp.*, No. 05-0585, 2006 WL 1997444, at 6 (W.D. Pa. July 17, 2006).  Objective criteria, on the other hand, are more concrete and can be measured against similarly situated individuals.  *Id.*

It is undisputed that at Plaintiff's interview she told Dillon that she was unable to work without "an approximate schedule for services needed rather than waiting for a call." (Satterwhite Dep. at 89:1-20.)  Plantiff testified that in November of 2006, it just didn't work for her schedule to receive a phone call at five after eight in the morning.  (*Id.* at 89:15-20.)  Plaintiff

---

[6] The Third Circuit reached this conclusion in the context of a mixed-motive plaintiff following *Price Waterhouse* analysis, but the *Makky* court went on to note, "[i]n this respect at least, requirements under *Price Waterhouse* do not differ from those of *McDonnell Douglas*." *Makky*, 541 F.3d at 215.

repeated this point in her November 1, 2006 follow-up letter to Dillon.  (Def.'s Mot. Ex. K

("[T]he on-call [] position will also be something I would consider provided I am given an

approximate schedule for services rather than waiting for a call.").)  Dillon testified that she

advised Plaintiff that the part-time, on-call position would not have a set schedule.  (Dillon Dep.

66:1-67:9 ("The nature of the position is that you would get a call between 8:15, even 8:30 and

you would have to get there as soon as you could.").)  The official job description for the position

states that the selected applicant is "to be utilized on an as needed basis."  (Def.'s Mot. Ex. L.)

Plaintiff freely admits that she told Dillon she was unable to meet that qualification.

Accommodating the on-call nature of the position is an objective qualification.  It is impossible

to work "on an as needed basis" and to have a set schedule simultaneously.  In April of 2008, as

soon as Plaintiff indicated that she was able to accommodate the on-call nature of the position

she was immediately hired as a part-time on-call secretary.  The evidence in the record is clear

that Plaintiff disqualified herself from the part-time on-call position.  Accordingly, Plaintiff

cannot establish a prima facie case of discrimination related to that part-time on call position.

 With regard to the substitute judicial secretary position, Montgomery County argues that

Plaintiff was not qualified for a substitute judicial secretary position because of her admitted

unwillingness to accept such a position as a result of her desire "not to disturb her pension."

(Def.'s Mot. 21; Satterwhite Dep. 90:6- 91:6).  The record contains undisputed objective

evidence to support this argument.  Plaintiff testified in her deposition that she was not interested

in a substitute judicial secretary position because she understood that if she went back to working

full-time for Montgomery County, her pension would be put on hold.  (Satterwhite Dep. 90:6-

91:6.)  She testified that she only expressed interest in the full-time position to "see what was

12

going to happen." (*Id.* at 92:11-12.)  Plaintiff testified that when she arrived at her meeting with

Dillon and Dillon indicated that there was an opening for a substitute judicial secretary position,

Plaintiff said, "[b]ut Carol, I'm not interested in a full time job.  I'm only interested in an on-call

part-time job." (*Id.* at 82:1-6.)  Later, when Dillon advised Plaintiff that a substitute judicial

secretary position was available in 2008, Plaintiff responded with a letter stating, "at this time I

will stick with the part-time judicial secretary position. . . .  My decision is due to the fact that I

do not want to disturb my [c]ounty [p]ension and therefore will prefer the part-time position."

(Def.'s Mot. Ex. U.)  Accordingly, we are compelled to conclude that Plaintiff was not qualified

for the substitute judicial secretary position.  Plaintiff was unwilling to accommodate this full-

time position because of the effect that it would have on her pension.

## IV.     CONCLUSION

The record in this case clearly establishes that Plaintiff disqualified herself from both the

substitute judicial secretary position and the part-time, on-call secretary position in the

Montgomery County Courts.  There was no racial discrimination here.  Accordingly, the Motion

For Summary Judgment filed by Defendants will be granted.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**